MARCIA E. ROGERS

*vs.*

THE KENNEBEC STEAMBOAT COMPANY.

Cumberland. Opinion February 24, 1894.

</div>

*Carrier. Negligence. Free Pass. Passenger. R. S., c. 51, §§ 9, 43.*

One who accepts and uses a free pass, as a pure gratuity, on condition that he will assume all risk of personal injury, must be deemed to have accepted it on that condition whether he reads it or not.

Such a contract, exempting a carrier from liability, is not prohibited by any

rule of public policy in this State, and is effectual to exonerate the carrier from liability for the negligence of his servants.

A person may become a passenger before the transportation has actually commenced.

ON MOTION AND EXCEPTIONS.

This was an action on the case brought in the Superior Court, for Cumberland County, to recover damages for personal injuries alleged to have been received by the plaintiff, through the negligence of the defendant's servants, while attempting to pass over the gang-plank, or bridge, from the defendant's wharf in Bath to their steamboat, on the twentieth day of November, 1890.

The plaintiff admitted that she was invited by a friend who had a pass for four ladies, to go from Bath to Boston by boat, but testified that she never saw the pass; and denied that at the time of the injury she was traveling on a pass, or had any knowledge or notice of the conditions it contained.

A material part of the declaration is as follows:

" And the plaintiff avers further that on the day last mentioned, in company with and by invitation of a friend, she came and was lawfully upon said wharf, with intention to go thence to Boston on the last mentioned steamboat, and that when said bridge or slip was fixed by the defendant for use and was open for such use by the defendant, and divers persons then standing on the wharf including the plaintiff and the friend aforesaid, were by the defendant invited to pass upon, across and over said' bridge to the steamboat aforesaid, then and on the day last named the plaintiff did enter and go upon said bridge or slip as so invited by the defendant to get access to the steamboat aforesaid, believing that the same bridge was safe and fit for use and not knowing the contrary. And further, the plaintiff alleges that when she entered upon said bridge as aforesaid, she understood that the friend aforesaid had in possession a pass or license issued by the defendant through some authorized agent, but never seen by the plaintiff, whereby the plaintiff was entitled to go upon said steamboat from Bath to Boston without the payment of any fare; and that the plaintiff then and there intended to seasonably ascertain whether such pass or license was in possession of the

friend, and in default of such pass, to pay to the defendant at the office aforesaid, or elsewhere as the defendant might prefer, the regular, usual legal price and fare charged by the defendant for the transportation of one person from Bath to Boston, and had in her possession lawful and sufficient money to make the payment aforesaid."

The jury returned a verdict for the plaintiff, and the defendant moved for a new trial, and also took exceptions which are stated, with the facts of the case, in the opinion of the court.

*Weston Thompson*, for plaintiff.

At time of receiving injury, plaintiff intended and was able to comply with all proper rules of the carrier. She intended, if required, when facts should be disclosed to defendant's ticket agent, or if she should find the alleged pass unacceptable, to pay her fare. She had not seen or accepted any pass, but supposed that Miss Niles had one that would carry her. She had not reached the place provided by defendant for receiving fares, or the carrier's agent who might decide upon the scope or validity of the pass, and was on the way to that place and agent by the means of access provided by the carrier. She intended no fraud or concealment, but intended to go on pass or ticket, in any event.

To escape liability for negligence, defendant relies on an alleged notice or contract on an alleged pass.

Contract or notice to limit carrier's "common law liability" is one thing; such contract or notice to exclude liability for carrier's negligence or that of its servants, is another thing.

Contracts (*a fortiori* notices) for the latter purposes are generally held void and ineffectual in America, except in New York and New Jersey, where with much dissent and some inconsistency, they have been upheld.

Against their validity : 17 Am. Rep. 719 ; 17 Wall. 357 ; 93 U. S. (3 Otto) 174 ; 95 U. S. (5 Otto) 655 ; 6 How. 344 ; 16 How. 469 ; 62 Maine, 488 ; 66 Maine, 239 ; 28 Am. Dec. 653 & n. ; 62 Am. Dec. 285 ; 77 Am. Dec. 183 ; 92 Am. Dec. 53 ; 98 Mass. 239 ; 100 Mass. 505 ; 55 Am. Dec. 481 ; 32 Am. Dec. 470 & n. ; 45 Am. Dec. 732 ; 31 Maine, 228 ; 54 Am. Dec. 513 ; 43 Am. Dec. 367, n. ; 10 Am. Rep. 89 ; 3 West, 839.

If common carrier's obligation arises from social duty and not from contract (14 How. 468) and is "determined by the policy of the law" (32 Am. Dec. 455), the foregoing cases seem to show the inevitable conclusion; and unless law has more regard for chattels than for human life (2 Am Rep. p. 365) the result must be as they declare it.

Against 53 Conn. 371, we cite 65 Tex. 640, and against 150 Mass. 365, we cite 20 Minn. 125. (S. C. 18 Am. Rep. 360.) We urge that those cases that sustain the contract do not appreciate the principle that the carrier's obligation is not founded on contract (14 How. 468; 32 Am. Dec. 455) or duly consider the question "lying behind" the one which they discuss, referred to in last paragraph in 5 Otto, 655.

*A. C. Stilphen*, and *Symonds, Snow and Cook*, for defendant.

SITTING: PETERS, C. J., WALTON, EMERY, FOSTER, HASKELL, WHITEHOUSE, JJ.

WHITEHOUSE, J.   On the evening of November 20, 1890, the defendant's steamer Kennebec arrived at the wharf in Bath about half-past five o'clock on her regular passage from Gardiner to Boston.   There was a fresh breeze from the northwest with a flood tide and freezing temperature, and the spray from the wheels caused ice to form on the guards of the steamer.   The gang-plank was adjusted so as to form a bridge or passage-way between the steamer and the wharf.   The plaintiff had come down from Brunswick by rail and was going on board as a passenger to Boston.   She was on the gang-plank and with a single step more would have been on the steamer, when suddenly by reason of the swaying of the boat, the end of the gang-plank resting on the steamer slipped from its place and dropped down over the margin of the guard.   The "lip" of the plank was thereby thrown upward and backward, the edge of it striking the plaintiff's leg and inflicting the injury of which she complains.

The plaintiff claims that the defendant's servants were guilty of negligence in the management of the gang-plank, and in this

action to recover damages for the injury thereby sustained, a verdict of $3,950 was rendered in her favor.

The case now comes to this court on exceptions and motion for a new trial. The defendant claims, first, that the evidence fails to show any negligence on the part of the defendant's servants on the occasion in question; and secondly, that the plaintiff became a passenger by virtue of a free pass which had printed on the back of it an express condition that the person accepting it must assume all risk of personal injury while using it.

The plaintiff admits that she was invited by Miss Niles to go to Boston by boat on a pass in company with Miss Niles and her two sisters, Miss Fannie Niles and Mrs. Remick; but says she never saw any pass, and denies that at the time of the accident she was travelling on a pass. She further says that, in any event, she had no knowledge of any condition on the pass in question which exempted the defendant from liability for personal injuries, and was not chargeable with any knowledge of such condition which Miss Niles and her sisters may have had. It is further contended that the terms printed on the back of the pass ought not to be construed as a contract against the defendant's liability for negligence, and finally it is insisted that it was not competent for the defendant as a common carrier of passengers to make such a stipulation against liability for negligence.

I. The plaintiff had undoubtedly consented to avail herself of the benefit of a free pass on the defendant's steamer to Boston. Her own testimony is clear and unequivocal on this point. She was informed by Miss Niles that a pass had been obtained "for four ladies" and accepted her invitation to go in place of one first invited who was obliged to decline. She admits that it was "distinctly understood" that she was to go on the pass, and that "no doubt was expressed by any one" as to her "being allowed to go on it." She "had always wished to go by boat" and accepted with pleasure this proffered courtesy from her friend. She afterwards stated that her employer would not have consented for her to leave at that busy season but for the favorable opportunity presented to her of going on a pass. She went from Brunswick to the wharf at Bath and stepped upon

the gang-plank of the steamer with the full expectation of a gratuitous passage to Boston and with no intention of paying her fare.    That such a pass was actually issued by the defendant and was in the possession of Miss Niles on the steamer, as well as at Brunswick, is conclusively shown by the uncontradicted testimony of Miss Niles and Mrs. Remick.    It was presented by the latter at the ticket office on the steamer for the purpose of obtaining a stateroom.    After obtaining the key the ladies went up stairs to the state-room assigned them, and the plaintiff there ascertained the extent of her injury.    The pass was returned to Mrs. Remick when she received the key, but in the excitement and confusion following the accident, it appears to have been lost.    Its terms are satisfactorily shown, however, by the testimony of the Niles sisters in connection with a copy of the pass in blank introduced in evidence.

It is equally clear that the plaintiff had become a passenger at the time of the accident.    She was at that moment within the protection of the defendant's servants and immediately after the injury was assisted by them to the ladies' cabin.    The steamer then left the wharf and proceeded on her course down the river. It was soon discovered, however, that the plaintiff's wound required the attention of a surgeon and the steamer put back to the wharf and the plaintiff returned to Brunswick that night.

It cannot be questioned that a person may become a passenger before the transportation has actually commenced, and before he has entered the carrier's vehicle.    In the familiar case of *Brien* v. *Bennett*, 8 C. & P. 724, the defendant's omnibus was passing on its journey and the plaintiff made a signal for the driver to stop and take him up.    The omnibus was accordingly stopped for that purpose and the door opened, but just as the plaintiff was putting his foot on the step the omnibus was driven along and the plaintiff thrown upon his face and injured.    It was held that the stopping of the omnibus at the plaintiff's request implied a consent to take him as a passenger, and that thereupon in attempting to enter the carriage he had the rights of a passenger.

In *Shannon* v. *B. & A. R. R. Co.* 78 Maine, 52, a person

waiting in the station for a passage on a train soon to depart, was invited by the ticket agent to sit in an empty car standing on the side track while the waiting room was being cleaned; and it was held that she was entitled to the same protection from the company while in this car as if in the regular waiting-room; in either place the person is a passenger in the care of the company. See also *Smith* v. *Railroad*, 32 Minn. 1; *Warren* v. *Railroad*, 8 Allen, 227; *Poucher* v. *Railroad*, 49 N. Y. 263; *Hannibal* v. *Martin*, 111 Ill. 219; *Allen* v. *Railroad*, 37 Iowa, 264; *Caswell* v. *Railroad*, 98 Mass. 194; Hutchinson on Carriers (2nd ed.), § § 556 to 565.

Upon the facts disclosed in the case at bar, it must be conceded that, at the time of the accident, the relation of passenger and carrier between the plaintiff and the defendant had been fully established. She clearly would have been a passenger if she had gone upon the gang-plank intending to procure a ticket at the office and pay her fare, and she was not the less so because travelling on a pass. Hutchinson, *supra*, § 565; *Shannon* v. *Railroad*, *supra*.

II. The plaintiff was travelling on a pass with the following conditions printed on the back of it, viz: "The person who accepts this pass thereby assumes all risks of personal injury and loss or damage of property while using it." The terms of this condition are clear and unmistakable. They are in effect the same as those on the "free ticket" in *Quimby* v. *B. & M. R. R.* 150 Mass. 366, and are sufficiently comprehensive to cover all risks of personal injury "of every name and nature" including those arising from the negligence of the defendant's servants.

But it does not appear that the plaintiff ever saw this pass, and she claims that she had no knowledge of the condition attached to it, and never assented to it. It is in testimony, however, that Miss Niles who procured the pass at Brunswick and Mrs. Remick who presented it at the ticket office on the steamer, had both examined the terms of it and knew that it contained a stipulation exonerating the defendant from liability for injuries. Miss Fannie Niles also learned from her sisters

that there was such a condition on it. Miss Niles and Mrs. Remick both testify that, in a conversation with the plaintiff in going from Brunswick to Bath on the evening of the accident, it was remarked "in a joking way" that they must be very careful as they were travelling on a pass at their own risk and could not recover any damages if they were injured. And on two or three other occasions before they reached the wharf, allusion was made, in the plaintiff's hearing, to the fact that they were "on a pass and at their own risk." The plaintiff says she has no recollection of any such conversation, and never understood, as a matter of fact, that they were travelling at their own risk by reason of express conditions on the pass or otherwise. However that may be, the defendant contends that in procuring the pass Miss Niles may properly be deemed to have acted as agent for those who accepted its benefits, and that the plaintiff is legally chargeable with the knowledge possessed by her agent.

But in the view here taken of the law it is unnecessary to determine whether either of the ladies travelling on the pass, ever read the conditions on the back of it, or had actual knowledge of the terms on which it was granted. It was evidently issued to "Miss Niles and three ladies" or contained some equivalent general description of the beneficiaries intended. The plaintiff consented to become one of them. It is immaterial that she was not the actual custodian of the pass. When she availed herself of the privileges secured by it, it became her pass as fully and effectually as that of Miss Niles. She knew that it was a mere gratuity and she had an opportunity to ascertain if any conditions were attached to the gift. Her omission to inform herself of its terms could give her no additional rights. The acceptance of a conditional gift necessarily involves a compliance with the conditions. A person accepting and travelling upon a free pass with conditions clearly expressed upon it, must be deemed to have accepted it on such conditions whether he reads them or not. This doctrine is elementary in the law of contracts, and is distinctly supported by the authorities respecting agreements for the carriage of passengers, as well as contracts for the transportation of goods and other bailments.

In *Quimby* v. *Railroad*, *supra*, the plaintiff was travelling on a free ticket which he had solicited as a pure gratuity from the general manager of the company.   On the back of it was printed an agreement that he should assume all risk of accidents, and on the face of it were these words : "Provided he signs the agreement on the back hereof."   In fact, however, this agreement was not signed by the plaintiff, but the court said : "The fact that the plaintiff had not signed it and was not required to sign it, we do not regard as important.   Having accepted the pass, he must have done so on the conditions fully expressed therein, whether he actually read them or not."   In *Fonseca* v. *Steamship Co.* 153 Mass.  553, it appeared that the plaintiff's attention was not called to the provisions of his passage ticket limiting the defendant's liability, but the court held that the defendant had a right to assume that he assented to its provisions, and that they were equally binding on him as if he had read them.

With respect to this question, the rules of law are applicable alike to contracts for the carriage of passengers and for the transportation of goods.   In *Hill* v. *Railroad Co.* 144 Mass. 284, there was a clause in the shipping agreement limiting the liability of the company to certain valuations.   The plaintiff offered evidence that his agent never read the shipping agreement which he signed, although he had full opportunity to do so, and did not in fact know that it contained any valuation of the animals.   But it was held that the plaintiff was bound by the agreement made in his behalf by his agent.   So in *Squire* v. *Railroad*, 98 Mass. 239, it was held that the plaintiff was bound by a similar shipping agreement although his agent signed it without reading it or informing himself of its contents.   See also *Grace* v. *Adams*, 100 Mass. 505 ; *Railroad* v. *Chipman*, 146 Mass. 107 ; *Hill* v. *Railroad*, 73 N. Y. 351 ; *Parker* v. *Railway*, 2 C. P. D. 416 ; *Harris* v. *Railway*, 1 Q. B. D. 515. The same principle is illustrated in contracts other than for transportation.   *Reinstein* v. *Watts*, 84 Maine, 139, and authorities cited ; *Rice* v. *Mf'g Co.* 2 Cush. 80 ; *Ins. Co.* v. *Buffum*, 115 Mass. 343.

Upon this branch of the case at bar the following instructions among others, were requested by the defendant, viz :

"A person accepting and traveling upon a free pass with certain conditions upon it must be deemed to have accepted it on such conditions whether he reads and signs them or not."

"If the pass was written to 'Miss Niles and three ladies,' or in any other similar general terms, and the plaintiff accepted it and intended to go upon it as one of the ladies referred to in it, then the plaintiff would be bound by the terms of the pass and cannot recover."

These requests were evidently prepared with direct reference to the authorities above cited and the principles above stated, but the presiding judge refused to give the former request and with respect to the latter said to the jury : "I give you that with this addition, that if she accepted it and knew the conditions that the pass imposed." The judge further instructed the jury upon this point, *inter alia,* as follows : "It is not sufficient that the writing was on the back of the pass which was in the hands of Miss Niles. . . In order to relieve the defendant company from liability under that contract the words written upon the back, placed there by the common carrier, must have been assented to by the person receiving the benefit of the pass. . . If you should find that she expected to travel on a pass simply without knowing that any conditions were attached to it, . . . or if she never assented to the conditions, then the defendant would be liable for the negligence of its servants."

This language of the charge in connection with the refusal to give the requested instructions, necessarily gave the jury to understand that something more was required of the plaintiff than the acceptance and use of the pass to constitute an assent to the conditions imposed. This must be deemed erroneous.

III. The plaintiff finally sets up the more radical contention that the condition on the back of the pass is not a valid and binding one, for the reason that it is not competent for a common carrier of passengers to stipulate against liability for injuries arising from his negligence. It is accordingly insisted that the instruction of the presiding judge that the plaintiff could not

recover if she assented to the terms of the pass imposing non-liability as a condition of granting it, was too favorable to the defendant; and even if there was error in the ruling above considered respecting the evidence of such assent, the defendant is not aggrieved and exceptions ought not to be sustained.

It is an undisputed fact in evidence in this case that there was no valuable consideration whatever for the granting of the pass. It was purely a matter of courtesy and gratuity. This court is thus for the first time brought face to face with the inquiry whether public policy will tolerate the exemption of a carrier from liability for injuries to free passengers resulting from the negligence of his servants. The precise question has not often been decided in other jurisdictions, but it is one with respect to which courts of great respectability and high authority have reached opposite conclusions. It cannot be said that there is any established or prevailing American doctrine upon the question, and this court is free to adopt the view which seems to be most in harmony with the principles of justice and sound reason and such considerations of public welfare as may be involved in the inquiry.

The general doctrine of bailments has always been subject to the watchful care and scrutiny of public policy, and the law of common carriers has undoubtedly been developed and moulded under its controlling influence. But the carriage of passengers is not bailment, properly speaking, and while there are obvious analogies between this service and the transportation of goods, the distinction between them, though practically modified in the progress of society, has never been abrogated by the law. A public carrier may transport both passengers and goods by the same conveyance and at the same time, but the nature of the responsibility incurred with respect to them is legally different. As a common carrier of goods he is an insurer against everything but the act of God and the public enemies; as a carrier of passengers he is liable for the utmost care and vigilance consistent with the character and mode of the conveyance, but is not accountable for failure to take every possible precaution against danger and accident. *Libby* v. *M. C. Railroad*, 85

Maine, 34, and authorities cited. It must be kept in mind, however, that a common carrier is one who undertakes *for hire* to transport the goods of all who choose to employ him, and that no person is in law deemed a common carrier who does not carry for hire. Edwards on Bailment, 426; Schouler's Bailments, § 405; Hutchinson on Carriers, § 57. So when it is declared in *Willis* v. *G. T. Railway*, 62 Maine, 489, to be well-settled law that common carriers cannot stipulate for exemption from responsibility for losses occasioned by the negligence of themselves or their servants, reference is had only to contracts to carry goods for hire. But ever since the "well-ordered exposition of the English law of bailments," in the celebrated case of *Coggs* v. *Bernard*, (Ld. Raym, 909, 1 Smith's Ld. Cas. 354,) those who undertake the gratuitous carriage of goods are deemed private carriers, and held liable only as mandataries; that is, only for losses resulting from gross negligence. And these may by contract protect themselves against liability for all losses except those occasioned by their malfeasance or fraud. Hutchinson on Car. § 14. It is true that in the absence of any agreement to the contrary, when a carrier has admitted a person to the rights of a passenger he owes him the same care and protection when traveling on a free pass as when he has paid the usual fare. Otherwise than this, there seems to be nothing suggested by the analogies between the settled law of common carriers of goods and that of passenger carriers, which militates against the right claimed for the latter to protect themselves by contract against liability for negligence with respect to gratuitous passengers.

It was been the tendency of the English courts from an early period to recognize the power of carriers to limit their liability with respect to both goods and passengers; and under the construction given to the several acts of Parliament in later years, a common carrier in England has practically unlimited power to provide by contract against liability for negligence. In *McCawley* v. *Railway Co.*, L. R. 8 Q. B. 57, (1872,) the plaintiff was traveling on a "drover's pass," which provided that he should travel at his own risk, and it was held that the de-

fendant was not liable even for gross negligence. Cockburn, C. J., said : "It was agreed that the plaintiff should be carried at his own risk, which must be taken to exclude all liability on the part of the company for any negligence for which they would otherwise have been liable." Quain, J., said : "Negligence, even gross, is the very thing which the contract stipulates that the defendant shall not be liable for." See also *Gallin* v. *Railway*, L. R. 10 Q. B. 212 ; *Alexander* v. *Railway*, 33 Up. Can. (Q. B.), 474.

The decisions of the New York and New Jersey courts also fully sustain the right of the carrier to contract with free passengers against liability for all degrees of negligence, provided the exemption is in clear and unmistakable terms. *Wells* v. *Railroad*, 24 N. Y. 181; *Poucher* v. *Railroad*, 49 N. Y. 263 ; *Magnin* v. *Dinsmore*, 56 N. Y. 168 ; *Dorr* v. *N. J. Nav. Co.* 1 Kernan, 485 ; *Kinney* v. *Railroad*, 32 N. J. Law, 409. See also *Railroad Co.* v. *Bishop*, 50 Geo. 465. Some courts seek to distinguish the different degrees of negligence and concede the right to make such exemption as to a free passenger, in all cases of ordinary negligence, but decline to extend the doctrine to cases of gross negligence. *Railroad Company* v. *Read*, 37 Ill. 484 ; *Railroad Co.* v. *Munday*, 21 Ind. 48. And others refuse to give effect to any stipulation absolving the carrier from liability for any degree of negligence. *Railroad Co.* v. *Henderson*, 51 Penn. St. 315 ; *Railroad Co.* v. *Curran*, 19 Ohio, St. 1; *Jacobus* v. *Railway Co.* 20 Minn. 125, (18 Am. R. 360) ; *Gulf, &c. R. R.* v. *McGowan*, 65 Texas, 640.

In the great case of *Railroad Co.* v. *Lockwood*, 17 Wall. 357, the Federal Court reached the conclusion that a condition on a "drover's pass," requiring the person using it to travel at his own risk, was not a valid and effectual one and could not exonerate the carrier from liability for negligence. It is important to notice, however, that this decision is put on the ground that a drover's pass was issued as a part of the contract for the carriage of the cattle, and could not be deemed a gratuitous one. At the close of the elaborate opinion in the case is a distinct finding, "that a drover traveling on a pass such

as was given in this case, for the purpose of taking care of his stock on the train is a passenger for hire." The same doctrine was applied in the later case of *Railway Co.* v. *Stevens*, 95 U. S. 655. There the servant of an inventor obtained a pass to see an officer of the road in regard to the use of a new coupling. As in the case of the drover it was held that he was a passenger for hire, and not bound by the condition that he should travel at his own risk. In each of these cases it is explicitly stated that it was not the purpose of the court to express any opinion as to the result which might have been reached if the plaintiff had been a free passenger instead of one for hire. These decisions of the Federal court, therefore, have no application to the precise question here raised. (See an interesting discussion of this question by Mr. Schouler, in Am. Law Rev. for March-Apr. 1892.)

On the other hand, the highest courts of Massachusetts and Connecticut, in able and exhaustive opinions of recent date, have held confidently and without hesitation that such special contracts relieving the carrier from liability to free passengers, are not forbidden by any principle of public policy. *Griswold* v. *Railroad*, 53 Conn. 371; *Quimby* v. *B. & M. Railroad*, 150 Mass. 365. In the former case, (decided in 1885,) the plaintiff's intestate was a youth employed by the keeper of a railroad restaurant, and had a free pass conditioned that he should travel at his own risk. He used it especially in running on the train to sell fruit and sandwiches, but at the time of the accident was traveling on his private account as the pass authorized him to do. The court finding that the railway had no direct interest in the restaurant or the traffic on the cars, decided, that the plaintiff was strictly a free passenger; and although he was killed in a collision resulting from the gross negligence of the defendant's servants it was held after a careful examination of the authorities, that he was bound by the terms of his pass, and the defendant was not liable.

But *Quimby* v. *B. & M. Railroad, supra,* is an important authority still more directly in point. In this case the plaintiff was unquestionably a free passenger. The pass was given him

"at his own solicitation and as a pure gratuity," with a condition upon it that he should, "assume all risk of accident of every name and nature." In the opinion by Mr. Justice Devens, the court says: "In such instances one who is ordinarily a common carrier does not act as such, but is simply in the position of a gratuitous bailee. . . . The service which he undertakes, to render is outside of his regular duties. The plaintiff was in no way constrained to accept the gratuity of the defendant. It had been yielded to him only on his own solicitation. When he did, there is no rule of public policy, we think, that prevented the carrier from prescribing as the condition of it, that it should not be compelled, in addition to carrying the passenger gratuitously to be responsible to him in damages for the negligence of its servants."

This result seems to be clearly in harmony with the principles of justice and common right. The term, "public policy," or "policy of the law," suggests but a vague and uncertain principle and sometimes seems to be invoked as authority for a decision when a more definite reason cannot readily be assigned. In what manner the public welfare or the safety of human life is involved, or any of the cherished interests of the law are invaded by allowing one out of a hundred passengers to travel on a pass at his own risk, does not clearly and satisfactorily appear. In most instances, it is believed, free passes are solicited by the traveler, not proffered by the carrier. The fact that a gratuitous passenger must travel at his own risk will surely operate as an incentive to greater care and caution on his part, and tend to diminish the number of passes issued. The probability that the cases of free transit will be so numerous as to induce any relaxation of the rules of prudence and vigilance on the part of the carrier is too remote to have weight as argument. He is constantly and it would seem sufficiently reminded of his obligations to the public, in the most forcible and effectual manner, by the numerous claims and large verdicts in favor of those injured who travel for hire. Nor is the number of passes likely to be so great as to involve the public interest by an increase in the rates of fare. In this State, furthermore, the

rates of fare on railroads are subject to, the control of the legislature or the railroad commissioners. R. S., c. 51, § § 9, 43.

In this case there is no suggestion of defective appliances or incompetent servants. The gang-plank was used continuously after the accident as before. It is claimed that there was negligence on. the part of the defendant's servants in the adjustment and management of the gang-plank under the peculiar conditions existing at that time. It is not pretended that there was willful misconduct and it cannot reasonably be claimed that there was gross negligence on the part of the defendant. There is, therefore, no occasion to draw a distinction between the degrees of negligence, if such a distinction is deemed legal and practicable in any case.

The conclusion is that one who accepts and uses a free pass, as a pure gratuity, on condition that he will assume all risk of personal injury, must be deemed to have accepted it on that condition whether he reads it or not; and such a contract is not prohibited by any rule of public policy in this State, but is effectual to exonerate the carrier from liability for the negligence of his servants.                    *Exceptions sustained.*

HASKELL, J., concurred in the result only.