Merrimack, }
Dec. 2, 1930. }

CHARLES WESSMAN *v.* BOSTON & MAINE RAILROAD.

MARY WESSMAN *v.* SAME.

*Joseph C. Donovan* and *Robert W. Upton* (*Mr. Upton* orally), for the plaintiff.

*Demond, Woodworth, Sulloway & Rogers* (*Mr. Jonathan Piper* orally), for the defendant.

BRANCH, J.   1. Although the plaintiff was riding upon a free pass, the relationship of passenger and carrier between her and the defendant was unaffected by that fact.   A person riding upon a pass is as much a passenger as if he had paid full fare (2 Moore, Carriers, 2d *ed.* 975. *Rogers* v. *Company*, 86 Me. 261), and is entitled to all the care and protection which the carrier is bound to furnish to paying passengers.   2 Hutchinson, Carriers, (3d *ed.*), *ss.* 1021, 1022.   *Todd* v. *Railroad*, 3 Allen 18, 21.   See 10 C. J., Tit: Carriers, *s.* 1310, where

the cases are collected. This relationship continued until she had a reasonable opportunity to leave the station. *Hill* v. *Railroad*, 77 N. H. 151. The defendant was bound to exercise ordinary care to have the station platform in reasonably safe condition for the use of all its passengers including the plaintiff. *Haselton* v. *Railway*, 71 N. H. 589; *Byron* v. *Railroad*, 82 N. H. 434. The agreement in question did not purport to relieve the defendant from its duty to exercise ordinary care with reference to the plaintiff. It merely granted to it a release from liability in case this duty was violated. The sufficiency of the evidence of defendant's fault with reference to the condition of the platform is not seriously questioned. It, therefore, follows that the motions for a nonsuit and a directed verdict were properly denied unless the plaintiff is barred from recovering by reason of the stipulation contained in the pass.

It is well established law that stipulations intended to relieve a common carrier from liability for negligence are invalid if the transportation is for hire, (*Baker* v. *Railroad*, 74 N. H. 100; *Peerless &c Co.* v. *Railroad*, 73 N. H. 328; *Durgin* v. *Company*, 66 N. H. 277; *Duntley* v. *Railroad*, 66 N. H. 263; 2 Hutchinson, Carriers, (3d *ed.*) ss. 1072-1074) but the contention of the plaintiff that there was legal consideration for the pass in question cannot be adopted in view of the provisions of our statute with reference to passes. P. L., *c.* 242, *ss.* 13-15. This statute provides that "no railroad corporation shall issue or give any free ticket, free pass or free transportation for passengers between points within this state except to its officers and employees and their families, . . . ," and forbids the rendering of service for any other compensation than that fixed by its schedules on file with the public service commission. If it were true, as the plaintiff argues, that "the pass on which Mrs. Wessman was traveling was issued at the request of Mr. Wessman in consideration of his services to the railroad," we should be forced to the conclusion that it was illegally issued, but the evidence does not justify this conclusion. The only testimony upon this point was that of the plaintiff Charles, who testified that after working for the defendant a year, he held an annual pass and "could get" trip passes for his family once a month; that he was "entitled to monthly passes" for his family and that the same "privilege" was accorded to other men working in the shop. This evidence would not justify and much less compel a conclusion that the railroad was under a legal obligation to issue the pass in question since this would violate the statute which forbids the rendering a service for compensation not men-

tioned in its schedule of rates. The court will not give to an agreement or understanding an interpretation which would render it illegal and void when there is a perfectly obvious sense in which it may be given legal effect. Anything but a free pass to members of an employee's family is forbidden by the statute. The railroad apparently undertook to comply with the statute—not to violate it. The pass in question was by its terms denominated a free pass, and must be so regarded. *Charleston &c. Railroad Co.* v. *Thompson*, 234 U. S. 576. It, therefore, becomes necessary for us to decide whether the holder of a free pass is bound by the terms of his agreement releasing the carrier from liability for personal injuries.

Although we have never before been called upon to determine this precise point, it can hardly be regarded as an open question in this jurisdiction. The policy of this state with reference to contracts designed to relieve a party from the consequences of the non-performance of his common-law duty to exercise ordinary care has been so plainly stated as to permit of only one conclusion. In *Baker* v. *Railroad*, 74 N. H. 100, 112, it was set forth as follows: "It is against the policy of the law to permit anyone, be he common carrier or not, to relieve himself by contract from the performance of his common-law duty to use ordinary care to avoid injuring those with whom he knew or should have known his business would bring him in contact." While this statement was not necessary to the decision in that case, it was accepted by a majority of the court as a correct exposition of public policy, and the principle therein enunciated was applied to its fullest extent as a basis of decision in the case of *Conn* v. *Company*, 79 N. H. 450. In that case, when considering the effect of a covenant in a lease, by which the lessee agreed to save the lessor "harmless from any liability by reason of personal injuries to any person or persons on or about the said premises," the court said: "It must be held either that the defendant did not agree to save the plaintiff harmless in so far as liability to its employees is concerned, or that, if it did, the agreement is illegal; for notwithstanding it is permissible for me to insure you against liability to others for injuries caused by your future misconduct, it is not permissible for me to agree to release you from liability to me for injuries caused by such misconduct." The court apparently regarded the principles thus enunciated as so well established that the citation of authorities in their support was unnecessary.

The foundation for the rule of policy above stated has not been given extended consideration, but from the language used in the

*Baker* case and the citation of *Nashua &c. Co.* v. *Railroad,* 62 N. H. 159, 161, it appears that the real reason for the rule is to be found in the cardinal importance attached to the doctrine of ordinary care in this state. The pre-eminent position here accorded to this canon of conduct is attested by the statements of the court in *Nashua &c. Co.* v. *Railroad, supra.* "Everyone in the conduct of his lawful business is bound to act with this degree of care, and if he fails to do so is responsible for the consequences. It follows that a person injured by reason of his want of ordinary care, or (since the law makes no apportionment between actual wrong-doers) by the joint operation of his own and another's negligence, is remediless. This general rule of law justly applied to the facts, determines, it is believed, the rights of the parties in all actions for negligence."

The unvarying application of this rule to varying relationships has frequently been exemplified. Interesting instances are to be found in *Benoit* v. *Perkins,* 79 N. H. 11; *Conway Nat. Bank* v. *Pease,* 76 N. H. 319; *Cavanaugh* v. *Railroad,* 76 N. H. 68; *Garland* v. *Railroad,* 76 N. H. 556, 567; *Burnham* v. *Stillings,* 76 N. H. 122, 123; *Hobbs* v. *Company,* 75 N. H. 73; *Pittsfield &c. Company* v. *Company,* 71 N. H. 522; *Edwards* v. *Lamb,* 69 N. H. 599; *Dunlap* v. *Dunlap. ante,* 352.

It is the declared policy of this state that the operation of this rule, which is reasonable in theory and salutary in effect, shall not be interrupted by private contract. There seems to be no occasion for announcing a different rule of policy with reference to the stipulations or agreements contained in free passes. Since we feel that the prior decisions of this court compel the conclusion which we have reached, a consideration of the state of the authorities in other jurisdictions will serve no useful purpose. Inasmuch as the pass in question permitted travel only within the limit of this state, the federal rule concerning passes for interstate travel is not involved.

Neither do we see any reason for drawing the distinction suggested by the defendant between "the negligence of the employees of the defendant" and the "negligence of the defendant itself." Counsel for the defendants concede that, so far as they have been able to ascertain, "no court has ever undertaken to draw the line in the case of a corporation which can act only through agents and servants" for the purposes of this rule. In the case of contracts for hire, no such distinction is permissible under the rule as it has been formulated in this state. "A common carrier cannot stipulate for exemption from responsibility for the negligence of himself or his servants on

grounds of public policy, or even by express contract." *Durgin* v. *Company*, 66 N. H. 277, 279. As indicated above, we think that a uniform rule should govern both special contracts for hire and free passes.

This conclusion disposes of defendant's exceptions to the denial of its requests numbered 3, 4 and 5, all of which were based upon the foregoing theory.

Defendant's counsel offer convincing reasons why the possible distinction suggested in *Baker* v. *Railroad, supra,* between delegable and non-delegable duties should not be adopted in this class of cases, and we are disposed to agree that such a distinction "has no place in the branch of the law which we are now discussing."

It follows that the trial court was correct in its ruling that the release of liability contained in the pass was void, and the motions for a nonsuit and a directed verdict were properly denied.

2. The defendant seasonably requested the court to charge the jury as follows: "There is no evidence of negligence of the defendant with respect to the roof or gutters on the train shed at Manchester which contributed to cause this accident." This request was denied and the defendant excepted. A determination of the question thus presented necessitates a further examination of the facts.

The station platform upon the east side of the defendant's tracks in Manchester, where the plaintiff fell, is constructed of concrete with a curb next to the rails. Over it is a slate roof which slopes toward the tracks and covers the whole of the platform except a strip of "approximately two feet around the edge." Along the eaves of this roof runs a built-in gutter from which the water is carried off in pipes. The plaintiff testified that she fell "about under the gutter or eaves of the roof" and that the cause of her fall was a "bunch" or "ridge of ice" about a foot wide and "perhaps half an inch or so high." It was the contention of the plaintiff that the water from which this ice was formed came from the gutter, which had either leaked or overflowed, and that the defendant was negligent in maintaining it in such a condition as to permit this escape of water. The court instructed the jury that there was "no direct evidence that the gutters were leaking at the time of this accident" but, subject to defendant's exception, submitted to them the issue whether "it is more probable than otherwise that the gutters were leaking at that time," and "that their condition was due to the negligence of the defendant or its employees."

The major premise of the plaintiff's argument in defence of this

ruling is thus stated in her brief: "The greater relative thickness of the ice and its location and shape would indicate that more water than the normal rain-fall had entered into its formation. There was no source from which this additional water could come except the gutter above." In support of the last assertion, reliance is placed upon the evidence of the "outside janitor" of the station who testified as follows: "Q. Were the gutters leaking? A. I couldn't tell you. I am not supposed to watch the gutters at all, not a bit. Q. Where did all this ice come from if the gutters didn't leak? A. I don't know. Q. Do you know of any other cause for it? A. No, sir. Q. How long had the gutters been leaking? A. I couldn't tell you, sir. ... Q. Didn't these gutters leak when you had rain? A. I don't know, sir. I never took notice at all. Q. How long did you work there? A. Six months. Q. You worked there six months and one of your duties was to sand the platform if there was any ice on it and you didn't find out whether or not the gutters leaked? A. I never found that out at all, ... Q. And you don't know whether the gutters leaked during that time? A. No, sir, I don't. Q. Why not? A. It is too far ago, I can't remember that. I never took notice of it."

The fact that this witness, while disclaiming any knowledge as to leaky gutters, or the actual cause of the ice, also disclaimed knowledge of other possible causes beside the one suggested by counsel, did not justify a conclusion that there was no other source from which water could have come. The witness did not even say that in his opinion there was no other source, he merely asserted or admitted his complete ignorance upon the subject. Such a statement regarding any controverted fact will not, in the absence of peculiar circumstances lending it unusual significance, support any conclusion as to the existence of the fact. It may be that if an expert, called to account for the happening of some abstruse phenomenon, should testify to a possible cause and add that he knew of no other, a conclusion that there was no other would be justified. But no such weight can be attached to the testimony of this witness. His position from beginning to end was, that the condition of the gutters and the cause of the ice were matters entirely outside his sphere of activity about which he knew nothing. Such testimony furnishes no logical basis for a finding of any fact regarding the subject under consideration. When, as in this case, it evidences a total disregard of other factors within the common knowledge of all, its worthlessness becomes doubly apparent.

The position of the ice under the eaves is the only fact which points to the gutters as a possible source of the water. Yet, there are many other possible explanations for the presence of this patch of ice. It is a matter of common knowledge that liquids of many kinds are carried by express, handled on station platforms and occasionally spilled. Everybody knows that perishable products are frequently packed in ice, and that the packages often leak. If this patch of ice was under the eaves of the roof it must also have been in close proximity to the eaves of cars passing through the station on the north bound track from which water might be thrown in stopping or starting. The ground was covered with snow, which might be carried onto the platform in many ways. In short the causes which may result in a small accumulation of ice on a station platform in New Hampshire in December defy enumeration. In the absence of tangible evidence that the gutter in question actually leaked or overflowed, the mere position of this piece of ice would justify nothing more than a surmise that the water from which it was formed might have come from the gutter. This is not the kind of proof which the law requires. *Deschenes* v. *Railroad*, 69 N. H. 285. The efforts of plaintiff's counsel to show that the gutters were leaky met with complete failure. The testimony that "they collect more or less cinders" came to nothing in the absence of evidence of their actual condition at the time, or that they actually overflowed. Since the plaintiff's argument fails at this crucial point it is unnecessary to consider its other weaknesses. Our conclusion is that it was error to submit to the jury any issue of negligence with reference to the condition of the gutters.

3. Subject to defendant's exception the plaintiff was permitted to testify that she did not read the pass before she signed it; that she did not know from any source what was in the paper that she signed; that she had only been to school for two terms and was not able to read well enough to read the pass. In any aspect of the case this evidence was immaterial, and for that reason, inadmissible. Under the law as it was declared by the presiding justice, it is plain that this evidence had no bearing upon any issue before the jury. If a contrary view of the law had been entertained it would have been equally immaterial. *Lauze* v. *Insurance Co.*, 74 N. H. 334; *Boering* v. *Railway*, 193 U. S. 442; *Quimby* v. *Railroad*, 150 Mass. 365. The prejudicial effect of this evidence cannot be doubted. By its admission the jury may well have been led to believe that the railroad had taken advantage of the plaintiff's ignorance to secure

her signature to a release which she could not read and did not understand. Defendant's exception to the admission of this testimony must be sustained.

On account of the foregoing errors the order must be

*New trial.*

All concurred.

ON REHEARING. After the foregoing opinion was filed the defendant moved for a rehearing upon the question whether a distinction should be drawn "between the defendant's personal negligence and the negligence of its employees," and argument was invited upon this motion.

*Demond, Woodworth, Sulloway & Rogers* (*Mr. Jonathan Piper* orally), for the motion.

*Joseph C. Donovan* and *Robert W. Upton* (*Mr. Upton* orally), opposed.

BRANCH, J. The argument of the defendant upon rehearing may be summarized as follows: that the defendant as a common carrier was not bound to transport the plaintiff without compensation; that in furnishing her free transportation it acted as a private carrier; that as a private carrier it might lawfully attach to the performance of such a service any conditions which would be valid between individuals; that a stipulation for release from liability for the negligence of its servants as distinguished from its "personal" fault does not offend the public policy of this state; that this distinction was recognized and applied in the case of *Piper* v. *Railroad*, 75 N. H. 228, and that the result which we have reached in the present case is inconsistent with that decision.

It seems plain to us that the case at bar is distinguishable from the *Piper* case upon at least three grounds, and the statement of these distinctions will serve to develop the answer to the rest of defendant's argument.

It is true that in the *Piper* case a contract purporting to relieve the defendant from all liability for personal injuries was held valid as to the negligence of the defendant's servants, but in appraising the force

of this decision as an authority it should be borne in mind that while a majority of the court concurred in the result, the published opinion represented the views of only two judges. It is plain, therefore, that this case settled the law only with reference to the factual situation there existing, and that the statements of the concurring judges cannot be relied upon as authoritative declarations of legal principles, although they may serve to delimit the scope of the majority decision.

I. With the foregoing considerations in mind the first distinction to be noted between the present case and the *Piper* case is that Mrs. Wessman was a passenger while Piper was not,—a fact which the concurring judges in that case thought to be of vital importance, as is shown by the following quotation from their opinion (*p.* 238): "But it is important to bear in mind that he [Piper] was not a passenger. ... He was not seeking transportation, either for himself, or as the agent or employee of the Express Company (*Webster* v. *Railroad*, 161 Mass. 298)—a circumstance of much importance which distinguishes this case from *Baker* v. *Railroad*, 74 N. H. 100." Again we read (*p.* 239): "Unlike a passenger, he did not seek the aid of the railroad charged with the public duty of transportation, but he sought and obtained from the railroad the privilege of working for the Express Company in the railroad's station." In accordance with the distinction thus clearly indicated it is plain that the present controversy should be decided in accordance with the *Baker* case and is not governed by the *Piper* case.

But we are told that this distinction is unsound. "Certainly," it is argued, "the fact that *Piper* was an express agent and this plaintiff a free passenger is immaterial." This contention will receive further examination, but at this point we are not interested in considering the validity of the distinction suggested in the *Piper* opinion. We merely point out that the concurring judges in that case clearly excepted passenger cases from the scope of their decision, and hence it cannot be held that the present case is governed by it.

II. The second ground of distinction between the present case and the *Piper* case is that the peculiar relationship between Piper and the railroad which formed the basis for the principal argument advanced in support of that decision finds no parallel in the present situation. The plaintiff there was an employee of an express company using the defendant's station platform in the performance of his duties. The court considered that "he was there as a servant engaged with the servants of the railroad corporation in the service of transportation on the road." He was regarded as an invitee whose situation approxi-

mated closely that of a fellow-servant with the employees of the defendant, and the contract was held valid only as to certain risks which he would have assumed if he had been in the defendant's employ, *i.e.*, the risk of injury from the negligence of fellow-servants. "The fellow-servant doctrine," said the two judges who joined in the published opinion, "is strong evidence that public policy recognizes such an agreement entered into by one in the plaintiff's position as valid and binding." *Piper* v. *Railroad, supra,* 242. Clearly the analogies of the fellow-servant relationship have no comparable application to the situation of the plaintiff in the case at bar, and hence the conclusion which we have reached need not be regarded as inconsistent with the decision in the *Piper* case.

III. The third distinction between the present case and the *Piper* case is one which goes to the very root of defendant's argument and is indicated by the language of the opinion above quoted: "Unlike a passenger," said the concurring judges, "he [Piper] did not seek the aid of the railroad charged with the public duty of transportation." Here it is clearly intimated that if Piper had been seeking of the railroad the performance of its "public duty of transportation" the result would have been different, and throughout that opinion it is assumed that if Piper had been "exercising a public right which the railroad cannot refuse to recognize" the release would have been invalid. This is undoubtedly the law as pointed out in our former opinion, and accordingly defendant's counsel are forced to contend that "the plaintiff in this case was not a passenger in the sense that she was receiving a service which she could demand of right and which the defendant was bound to perform." "Granted," they say, "that a paying passenger has a right to demand of the railroad the full performance of its common law duty, the railroad owes no common law duty to carry free passengers and its freedom of contract with respect to the carriage of such passengers should not in reason be any more limited than in the case of the expressman. Neither have a right to demand the particular service which they ask for."

Counsel here confuse the nature of the service rendered with the terms upon which it was to be performed. The provisions of the contract by which a railroad undertakes a given service do not at all determine whether the service is one which as a common carrier it could be compelled to perform. The nature of the service is indicated by the character acts involved in its performance, and in order to ascertain whether a given service constitutes a part of the public duty of a common carrier the decisive inquiry is whether "these acts are such

as the carrier *must* perform." *Russell* v. *Railway,* 157 Ind. 305. "Common carriers are such by virtue of their occupation, and not by virtue of the responsibilities under which they rest." *New York Central R. R. Co.* v. *Lockwood,* 17 Wall. 357, 376.

The Pullman porter cases of which *Russell* v. *Railway, supra,* is a sample, the express messenger cases like *Baltimore &c. Railway* v. *Voigt,* 176 U. S. 498, and the circus train cases like *McCree* v. *Davis,* 280 Fed. Rep. 959, all lend point to this distinction. Many courts have asserted that railroads do not hold themselves out as engaging in the business of hauling Pullman cars or circus trains or carrying express, and it has been held that the very nature of the exceptional service desired in these cases made it clear that in undertaking them railroads acted outside the scope of their public undertaking as common carriers. We need not consider here the question whether these decisions are in conflict with the reasoning and the conclusion of this court in *Baker* v. *Railroad,* 74 N. H. 100. It is sufficient to point out the fact that the things which the railroads were asked to do in these cases—the character of the physical acts of service required—were the criteria relied upon by the courts to determine the public or private nature of the undertaking.

Thus considered, it is plain that Mrs. Wessman required of the defendant no unusual or extraordinary service. Unlike the plaintiff in the *Piper* case, she was seeking transportation for herself. What she asked of the defendant was to be carried from Concord to Manchester upon one of its regular passenger trains. This service was one which the defendant as a common carrier was bound to furnish to all comers. The incidental arrangement of the parties in regard to compensation did not affect the nature of the service or the character of the acts necessary to its performance. For the same reason it did not affect the legal duty of the defendant as a common carrier to transport her safely. Its legal right to refuse free transportation did not operate to curtail its legal duty toward a free passenger once the transportation had been undertaken. The liability of a common carrier does not depend on the fact that compensation for the passage is paid to the carrier, nor does its duty to carry safely result alone from the consideration paid. "It is imposed by the law, even where the service is gratuitous." *Philadelphia &c. Railroad* v. *Derby,* 14 Howard 468, 485. " . . . it makes no difference whether the service is performed gratuitously or not, in regard to the obligation to perform it well, after it is once entered upon; for, ever since the decision of the leading case of *Coggs* v. *Bernard,* (2 Smith's Leading Cases 82),

it has been regarded as sound law, that 'the confidence induced by undertaking any service for another, is a sufficient legal consideration to create a duty in the performance of it'." *Mobile &c. Railroad* v. *Hopkins*, 41 Ala. 486.

That the duty of a carrier to a free passenger is identical with that which it owes to a paying passenger is the uniform holding of many cases in which free passengers have been allowed to recover for personal injuries in the absence of a release. *Louisville &c. Railway* v. *Faylor*, 126 Ind. 126; *Todd* v. *Railroad*, 3 Allen 18; *Wilton* v. *Railroad*, 107 Mass. 108; *State* v. *Railroad*, 63 Md. 433; *Lemon* v. *Chanslor*, 68 Missouri 340; *Waterbury* v. *Railroad*, 17 Fed. Rep. 671; *Washburn* v. *Railroad*, 3 Head (Tenn.) 638; *Steamboat New World* v. *King*, 16 How. 469; *Philadelphia &c. Railroad* v. *Derby*, 14 How. 468; *Thompson* v. *Railroad*, 47 La. Ann. 1107. To these cases should be added those in which a recovery has been permitted despite the giving of a release. *Pennsylvania Railroad* v. *Butler*, 57 Pa. St. 335; *Gulf &c. Railway* v. *McGown*, 65 Texas 640; *Mobile &c. R. R.* v. *Hopkins*, 41 Ala. 486; *Norfolk & Western Ry* v. *Tanner*, 100 Va. 379; *Bryan* v. *Railway*, 32 Missouri App. 228; *St. Louis &c. Railway* v. *Pitcock*, 82 Ark. 441; *Williams* v. *Railroad*, 18 Utah 210; *Rose* v. *Railroad*, 39 Iowa 246; *Chicago &c. Ry* v. *Collier*, 1 Neb. (unof.) 278. And the soundness of this rule is recognized in many of the cases relied on by the defendant. See particularly *Buckley* v. *Railroad*, 113 Me. 164.

According to the foregoing authorities as well as those cited at the outset of the former opinion, Mrs. Wessman, as soon as she came upon the defendant's premises to begin her journey, became a passenger to whom the defendant owed all of its common carrier duties of service and protection. To the performance of these duties the doctrine of *respondeat superior* applies without limitation, and ever since the decision of the supreme court of the United States in *New York Central R. R.* v. *Lockwood, supra*, it has been well established law that a common carrier cannot effectually "stipulate for exemption from responsibility for the negligence of himself or his servants." *Ib.* 384. Such was the declaration of this court in *Durgin* v. *Company*, 66 N. H. 277, 279, and this principle is decisive of the present case.

The defendant seemed finally to concede at the argument that, in the absence of a release, its liability to the plaintiff would be that of a common carrier to its passenger and it was then driven to contend that the execution of the release *ipso facto* altered their relationship and divested the defendant of its common carrier obligations so far as the plaintiff was concerned. The argument is thus stated: "She

was not a passenger when she negotiated for the pass, when she made the contract in question and the defendant in giving it to her was not acting as a common carrier. She could not demand the pass and the railroad was under no duty to give it to her . . . she was not asking the defendant to perform its public duty for hire. She chose instead to deal with it as a private individual and to accept a gratuity outside its public duty."

The assertion that the defendant in giving her the pass "was not acting as a common carrier" is inconsistent with the language of the statute, which, while forbidding any railroad corporation "acting as a common carrier of passengers" to issue or give any free pass for passengers between points within this state, specifically excepts from this prohibition "its officers and employees and their families." P. L., c. 242, s. 13. Unless the pass in question was issued by virtue of this authority its issuance was illegal and all its provisions and stipulations would be void, as stated in the former opinion. If issued under authority of the statute it must have been issued by the defendant as a common carrier since it is plain that the only purpose of the exceptions in the statute was to permit common carriers to do in certain special situations that which they are generally forbidden to do.

If, as the defendant argues, a railroad lays aside its public character and acts as a private carrier whenever it issues a free pass it would follow that free passes could be issued without restriction since it is only to railroads acting as common carriers that the prohibition of the statute applies. Of course, an act of the legislature cannot be nullified in this way and the defendant's argument must be fallacious. The nature of the fallacy is not far to seek. It is the well known error of arguing in a circle.

The claim is that by negotiating a special contract with the plaintiff the railroad laid aside or was divested of its character as a common carrier, and that the contract is valid because it is one which a private carrier might lawfully make. In other words, the contract is good because in making it the defendant acted as a private carrier, and it acted as a private carrier because it made the contract. This fallacy was early pointed out by *Mr. Justice Bradley* in *New York Central R. R.* v. *Lockwood, supra,* and has not escaped the attention of other courts. *Norfolk &. Western Ry* v. *Tanner,* 100 Va. 379.

The most persuasive part of the defendant's argument is the suggestion that to permit the plaintiff to repudiate her release after accepting the benefits of the pass would be contrary to common con-

ceptions of honesty and fair play. The following language from the case of *Duncan* v. *Railroad*, 113 Fed. Rep. 508, 514 has been repeatedly urged upon our attention: "The result we have reached conforms the law applicable to the present issue to that moral sense which justly holds those who accept gratuities and acts of hospitality to perform the conditions on which they are granted."

One answer to this argument has been well stated by the supreme court of Arkansas as follows: "It is not a question of benevolence and hospitality on the part of the carrier in giving, nor the violation of moral obligation on the part of the passenger in receiving without being bound by the terms of the agreement upon which the gratuity was offered and accepted. The question is one of public duty which the State, as *parens patriae*, having due regard for the lives and limbs of all her subjects, will not permit to be relegated to the domain of private contract." *St. Louis &c. Ry* v. *Pitcock*, 82 Ark. 441.

Perhaps the most convincing answer to defendant's argument, however, is that it proves too much. The same considerations of honesty and fair play would require that all contracts of a common carrier for exemption from liability based upon rate concessions and other special circumstances when fairly entered into should be enforced, but this is nowhere the law in America. The fair play argument often has to yield to other considerations. It cannot be given paramount importance here.

*Former result affirmed.*

All concurred.