Strafford
No. 87-139

THE HOME GAS CORPORATION

v.

STRAFFORD FUELS, INC. AND
EDWARD C. DUPONT, JR., INDIVIDUALLY

November 5, 1987

*Sheehan, Phinney, Bass & Green P.A.*, of Portsmouth (*Peter F. Kearns* on the brief and orally), for the plaintiff.

*Upton, Sanders & Smith*, of Concord, and *Gary R. Cassavechia*, of Rochester (*Russell F. Hilliard* and *Mr. Cassavechia* on the brief, and *Mr. Hilliard* orally), for the defendants.

SOUTER, J. The defendants appeal from orders of the Superior Court (*Gray*, J.) enjoining them from engaging in certain business practices that the plaintiff claims to be prohibited by the terms of a distributorship agreement executed in 1982. As we read the orders, they prohibit the defendants' use for their own competitive purposes of lists naming liquefied petroleum gas (LPG) customers whom the defendant Strafford Fuels, Inc. previously served on the plaintiff's behalf, and they generally prohibit the defendants from competing with the plaintiff for LPG business in the Rochester, New Hampshire, service area for one year. We do not understand that the defendants have appealed the orders specifically enjoining their use of the customer lists and, in any event, we leave those orders undisturbed to the extent that they refer to lists of customers that Strafford Fuels previously served as the plaintiff's distributor. To the extent, however, that the orders generally enjoin the defendants from competition with the plaintiff, we reverse.

The plaintiff, Home Gas Corporation, sells about twenty-nine million gallons of LPG each year through distributors in New England and parts of New York. Its principal competitors are known commonly as Eastern Propane, Pyrofax and Suburban Propane. In December, 1982, Home Gas entered into a distributorship agreement with Strafford Fuels, which eventually covered a period ending on August 15, 1986, the effective date of Strafford Fuels' decision to terminate the contractual relationship without cause, as permitted by the terms of the agreement. The 1982

agreement follows a standard form of 33 articles prepared by Home Gas, and generally provides that Strafford Fuels will service and install LPG equipment bearing the Home Gas label and will supply customers with LPG purchased from Home Gas.

The particular provisions relevant to the dispute before us are contained within articles 15, 16, 17 and 31. Article 15 provides that purchasers' accounts are the property of Home Gas, and that records relating to those accounts must be transferred to Home Gas immediately upon termination of the agreement. Article 16 provides that during the term of the agreement, and for such further period as a covenant contained in article 17 may be effective, Strafford Fuels will not disclose such records to anyone or use the records for its own purposes.

Article 17 is entitled "Covenant Not to Compete," and the exact language of its basic provisions is significant enough to be set out verbatim:

> *"ARTICLE XVII: Covenant Not To Compete*
>
> During the term hereof and for a period of one (1) year after the termination of the Agreement for any reason, [Strafford Fuels, Inc.] shall not directly or indirectly enter the employ of, as an agent, representative, salesman or otherwise, or become interested or affiliated in any manner or connected with, any agent, representative or Distributor of LPG or with any other entity providing products or services commonly provided by [Home Gas] within the territory referred to in ARTICLE II hereof."

Article 31 likewise warrants quotation:

> *"ARTICLE XXXI: Captions and Paragraph Headings*
>
> The captions and paragraph headings used in this Agreement are for convenience only and do not form a part of the Agreement for the interpretation or construction hereof."

After executing the agreement, Home Gas provided Strafford Fuels with a list of some 283 customers in the area of Rochester, and thereafter Home Gas supplied a further list of ninety-six names. From time to time during the term of the parties' relationship, old customers discontinued purchases and Strafford Fuels obtained new ones, but the average sales base of about 400 customers remained constant throughout the period. During its 1986 fiscal year, Strafford Fuels sold these customers 40,000 gallons of LPG on behalf of Home Gas, which accounted for $55,000 of Strafford Fuels's gross revenues of $2,500,000.

According to Home Gas's uncontested offer of proof in the superior court, immediately after terminating the agreement in August, 1986, Strafford Fuels used its computerized list of LPG customers in mailing some 400 letters soliciting business on its own behalf as an independent LPG distributor. Strafford Fuels conducted another mass mailing a short time later, and solicited further LPG business from the general populace in and around Rochester by radio and newspaper advertising. As a result of these initiatives, at least 200 former Home Gas customers in the area now purchase LPG and obtain related services from Strafford Fuels, while Home Gas retains only about sixty of its former customers.

In order to obtain the LPG it needs, Strafford Fuels has made purchases, not from any of Home Gas's three major regional competitors, but from an independent fuel dealer in North Haverhill, New Hampshire, selling under the name of Patton Gas. There is no evidence that Strafford Fuels enjoys a contractual relationship with Patton entitling it to obtain any given level of supply or obligating it to buy from Patton in any particular amount. When Strafford Fuels does make a purchase from Patton, another independent dealer in Old Orchard Beach, Maine, Champagne Gas, stores the gas in a bulk tank from which Strafford Fuels removes it for delivery to its customers.

Home Gas began the instant action in October, 1986, and named Strafford Fuels's president, Edward C. Dupont, Jr., as a co-defendant, since he had previously guaranteed the corporation's obligations under the agreement. Home Gas alleged that the parties' agreement "provides that for one year after termination . . . the defendants shall not directly or indirectly compete with the plaintiff in the sale of LPG within the defendants' former territory . . . of Rochester and its vicinity." The pleadings contained no express reference to the customer lists or to the defendants' use of them, but Home Gas did allege that the defendants had violated the covenant not to compete when they "openly solicited the LPG accounts of the plaintiff, directly, by mail, by news media including but not limited to radio advertising and . . . otherwise competed with the plaintiff . . . causing irreparable harm and damage." Home Gas sought an order that would enjoin the defendants generally "from selling or advertising to sell LPG in . . . Rochester and its vicinity or otherwise competing with the plaintiff in the sale of LPG in accordance with the terms of the contract," and requested ancillary relief including an accounting for profits.

In November, 1986, the Superior Court (*McHugh*, J.) temporarily enjoined the defendants from soliciting plaintiff's customers and from selling LPG in the Rochester area. In March, 1987, the matter came before Gray, J., on Home Gas's request for a permanent injunction. After receiving oral stipulations of fact and uncontested offers of proof, and after hearing the testimony of the defendant Dupont, Gray, J., issued an order dated March 19, 1987, in which he discussed the plaintiff's claim and made narrative findings of fact and conclusions of law. Although the findings of fact adverted to the customer lists, the conclusions of law referred not to articles 15 and 16 of the agreement, which deal with the lists, but to article 17, which prohibits certain forms of competition. The court ruled that article 17 was enforceable by injunctive relief under the standards set out in *Smith, Batchelder & Rugg v. Foster*, 119 N.H. 679, 682, 406 A.2d 1310, 1311 (1979) and concluded that

> "[t]he defendant's violation of the covenant deprives the plaintiff of the revenues and goodwill which it would obtain were it serving those customers transferred to the defendant. A refusal to enforce the covenant could result in a permanent deprivation of such revenues for which the plaintiff would have no adequate remedy at law. Thus plaintiff's petition for injunctive relief is GRANTED."

The court then set the period of time to be covered by the order, a matter that is not here in issue. Suffice it to say that the case is not now moot.

Contrary to Superior Court Rule 161(d), however, the court never issued an injunction specifically describing prohibited conduct or granting particular relief to the plaintiff. After the defendants had filed motions to clarify and to stay the order, Home Gas filed a "motion for affirmative relief," by which it requested, *inter alia*, orders that

> "(a) The defendants shall forthwith provide the plaintiff with an updated customer list and a schedule of deliveries;
>
> (b) The defendants shall remove their equipment from the homes of the LPG customers once such deliveries come due;
>
> (c) The plaintiff is empowered to place its equipment on such homes and resume deliveries, subject to a determination of the wishes of the customer as to the resumption of a relationship with the plaintiff;

(d) The defendants shall write a letter completely outlining the implementation of the court's order and explaining same and send such letter to each and every customer forthwith, such letter being subject to the approval of the plaintiff."

The court granted Home Gas's motion on April 22, 1987, and the defendants appealed.

The disposition of the appeal does not call for our resolution of any disputed issue of law, but turns rather on our analysis of the parties' agreement, in accordance with accepted standards of interpretation. Before we reach the language of the agreement itself, however, clarification is needed on two threshold matters: the scope of the injunction and the scope of the appeal.

As we observed before, the superior court orders fail to state exactly what the judge intended to prohibit. We read the narrative findings and rulings of March 19, granting the petition, as an acceptance of the plaintiff's claim that the defendants' conduct of any LPG business within the Rochester area during the year following termination of the agreement violates article 17, and we accordingly must read the order as an injunction against any such business activity in the area for the period in question. Although the court's later order granting the plaintiff's "motion for affirmative relief" has the effect of adding more specific terms to its earlier prohibition, including a requirement to deliver the defendants' current customer list, the later order is not limited solely to the enforcement of the customer list provisions of articles 15 and 16. We therefore read the two orders together as intended to enjoin, *inter alia,* any competition by the defendants in LPG sales and service in the area for a one-year period.

In considering the scope of the appeal, we note that in their brief the defendants concentrate on the meaning of article 17 in relation to their dealings with Patton, but nowhere argue that restrictions on the use of the pre-termination customer list are not enforceable. We therefore understand the scope of the appeal as challenging the trial court's orders insofar as they generally enjoin any competition, but not to the extent that they merely enforce the prohibitions on the use of the customer list as it existed on August 15, 1986. We may add only that this strikes us as a sensible position to take, for we have heard nothing to suggest that the very specific and limited restrictions on the use of that pre-termination list should not be enforced by a court of equity. *See Smith, Batchelder & Rugg v. Foster,* 119 N.H. at 682, 406 A.2d at 1311.

We turn now to the merits. The defendants argue on three separate grounds that the orders were erroneous: article 17 does not apply when a party terminates the agreement without cause; an injunction is inappropriate because, *inter alia*, the plaintiff may bring an action at law for lost profits; and article 17 does not prohibit competition generally or prohibit any of the defendants' competitive acts, aside from their use of the pre-termination customer lists. Because we find merit in the third ground, we need not speak to the first two.

The force of the defendants' position appears as we address the meaning of article 17 from a settled and undisputed interpretive stance. "[T]he law does not look with favor upon contracts in restraint of trade or competition and . . . they are not to be extended by construction beyond the fair import of the language contained therein." *Dunfey Realty Co. v. Enwright*, 101 N.H. 195, 197, 138 A.2d 80, 82 (1957) (citations omitted); *Bowers v. Whittle*, 63 N.H. 147, 148 (1884). And although the court perhaps grew in candor when it held more recently that in so confining the scope of such covenants they are generally to be given narrow constructions, *see Gosselin v. Archibald*, 121 N.H. 1016, 1022, 437 A.2d 302, 307 (1981), it is not necessary to invoke a rule of restrictive interpretation in order to conclude that article 17 provides no such pervasive limitation on competition as Home Gas claims for it.

Home Gas's first and most obvious difficulty is the failure of article 17 to employ general language expressly prohibiting any competition with the plaintiff. It is true, of course, that the article is entitled "Covenant Not to Compete," but in article 31 the parties agreed that "captions and paragraph headings . . . are for convenience only and do not form a part of the Agreement for the interpretation or construction [t]hereof." The title is therefore devoid of significance, and any restriction on the defendants' permissible activities must derive from the text of the article itself.

The text, however, is less expansive than its title. Where the article might have contained an express and general prohibition of competition, it provides instead that Strafford Fuels may not enter into certain relationships with distributors of LPG or providers of related services. Strafford Fuels may not "enter the employ of" or "become interested [in] or affiliated in any manner or connected with" those who distribute LPG or provide "products or services commonly provided" by Home Gas. While a glance at the full text quoted earlier in the opinion will reveal a lawyer-like attempt to describe the prohibited relationships, the only basic restrictions are the two quoted above: against employment by a distributor or

provider of LPG or related service, and against acquisition of an interest in or affiliation or connection with such a distributor or other provider. The article contains no express prohibition of competition generally.

When we ask whether any of the relationships prohibited by article 17 is alleged in the pleadings or disclosed by the factual record, we can eliminate one possibility immediately. The plaintiff does not, and could not reasonably, claim that either defendant has entered into any prohibited employment relationship. If, then, the defendants have committed or threatened any breach of article 17, the violation must necessarily consist of becoming or threatening to become "interested" in or "affiliated" or "connected with" a distributor or other provider of LPG products or services so as to compete in the service area, and we must scrutinize these terms with some care.

We note, first, that there is no evidence that the parties intended to attach abnormal definitions to the quoted words, or to use them as terms of art. Our inquiry, therefore, is about their meaning in common usage, *see Bowers v. Whittle*, 63 N.H. at 198, and in applying that criterion we construe article 17 to forbid only an ownership relationship or a relationship of continuing contractual obligation.

To be specific, barring a relationship of "interest" is most fairly understood to bar the acquisition of property rights derived from ownership, or the acquisition of contractual rights to control the disposition of property or the benefits derived from its use. The definitions of "interest" included in Webster's Third International Dictionary, applicable in a commercial context, speak of a "right, title or legal share in something" or the entity "in which one has a share of ownership or control." Presumably such control could derive not only from title to property, but from a contract limiting the parties' otherwise unqualified powers of management, or their otherwise unfettered choices among commercial options.

"Affiliation" likewise implies a relation commonly resting on rights of ownership. Webster's definitions of the verb form "affiliate" include "to attach as a member or branch" or to "join" in like manner. Its definitions of the noun form mention a "subsidiary" and speak of "a company effectively controlled by another or associated with others under common ownership or control."

The article 17 prohibition against a "connection" is, at first blush, broader and more vague than the preceding limitations. Webster's speaks of a "connection" as a "commercial relationship in a practical or active way" and as a "permanent or continuing ar-

rangement to execute orders or advance interests especially at a distance." Despite the breadth of these definitions, we believe that the more restrictive sense of a "permanent" commercial arrangement is the connotation that is most true to the present context, for article 17 uses the phrase "connected with" in a sentence that includes the clearly more restrictive terms "interested or affiliated." Thus the broader term itself takes on the more specialized character of its neighbors, under the rule that applies as well to one term within a series as it does to an individual within a group, *noscitur a sociis*. CORBIN ON CONTRACTS § 552, at 203 (1960).

This tighter view of "connection" is confirmed, moreover, by the way we commonly think of relationships arising from sales and purchases of supplies. One may buy groceries from the same market each week, year in and year out, without being spoken of as "connected with" the grocer. Nor is the plumber who customarily obtains his pipes and pumps from the same wholesaler said to have a "connection" with the wholesaler, in the absence of an agreement for a more enforceably advantageous relationship than habit or open marketing may happen to produce. While the English language may be too fluid to posit a threshold level of "connection" in the abstract, we commonly use the term to require something more than the mere expectation of future dealing that either of two parties is entirely free to decline in favor of alternative transactions with third parties.

If we doubted that our common conceptions supported this more demanding view of "connection," we would resolve the doubt against the plaintiff under the rule in *Gosselin v. Archibald*, 121 N.H. at 1022, 437 A.2d at 307. As we have already said, however, the policy of construing restrictive covenants narrowly is not crucial to our view of the language in issue here. In summary, then, we read article 17 as forbidding only a relationship characterized by enforceable rights of ownership or continuing contractual obligation.

 Given our view of the covenant, the record presents no basis to find a breach or threatened breach of its terms. We are unable to identify any evidence, or even an offer of proof, that would suggest the defendants' relationship with Patton is anything more than it purports to be, a series of purchases and sales that are advantageous to each party. There is no evidence that Strafford Fuels gets a lower price than that obtained by Patton's other volume customers, or that Patton could prevent Strafford Fuels from buying elsewhere on better terms. Presumably, to be sure, the

defendants expect that Strafford Fuels will continue to buy from Patton, and Patton entertains a like expectation. The series of purchases and sales may well extend into the future for so long as their advantages mutually endure. But there is no evidence, or evidence claimed, that either Strafford Fuels or Patton is subject to any enforceable obligation to the other party extending beyond their most recently completed individual transaction. Nor is there the remotest indication that Patton has acquired or plans to acquire any legal or equitable ownership interest in Strafford Fuels, or that Strafford Fuels or Dupont have or plan to acquire any such interest in Patton. Hence, we conclude that the record discloses neither an actual nor a threatened violation of article 17, and the orders of March 19, 1987, and April 22, 1987, must be modified to remove the bar to general competition with the plaintiff.

■ Perhaps it is well to add, however, that our reading of article 17 does not mean that the defendants are as free to compete with the plaintiff as they would have been if they had not violated the restrictions on the use of the pre-termination customer list. It may well be that the need to provide effective legal and equitable remedies for the defendants' breaches of article 15 and 16 will require the superior court to limit the defendants' dealings with pre-termination customers in ways that article 17 alone would not authorize the court to order. On remand, therefore, the superior court should stand ready both to enjoin any future or continuing violations of the pre-August 15, 1986, customer list restrictions, and to enforce the plaintiff's contractual rights with equitable remedies calculated to eliminate whatever competitive advantages the defendants have already obtained in breach of articles 15 and 16.

*Affirmed in part; reversed in part; remanded.*

All concurred.