Hillsborough
No. 89-428

TECHNICAL AID CORPORATION

v.

SHERMAN JOHN ALLEN, JR. & a.

March 13, 1991

2

4

*Law offices of Randall E. Wilbert*, of Nashua (*Robert G. Hendricks* on the brief, and *Randall E. Wilbert* orally), for the plaintiff.

*Winer and Bennett*, of Nashua (*Gary A. Braun* on the brief and orally), for the defendants.

JOHNSON, J. This is a bill in equity in which the plaintiff, Technical Aid Corporation (Technical Aid), seeks money damages against two former employees, Sherman John Allen, Jr., and Mark E. Redmond, and against E & S Associates of Hudson, Incorporated (E & S). Technical Aid alleges that Allen violated various restrictive covenants contained in his employment contract with Technical Aid, and that Redmond and E & S intentionally interfered with Technical Aid's contractual relationship with two former Technical Aid employees.

The Superior Court (*M. Flynn*, J.), sitting without a jury, held a two-day trial beginning on September 20, 1988. On August 16, 1989, the court issued findings and rulings, and dismissed Technical Aid's petition. The court found all the restrictions in Allen's contract at issue to be unenforceable, not to have been violated, or both. Independent of the above rulings, the court also found that the liquidated damages clause was unenforceable. Finally, the court found that Technical Aid had neither proved its intentional interference with contractual relationship claims, nor proved any resulting damages. We affirm in part, reverse in part, and remand.

Technical Aid raises the following issues on appeal: (1) whether the post-employment restrictive covenants of Allen's contract are reasonable and enforceable; (2) whether Allen's involvement in the genesis of E & S while still employed at Technical Aid, and E & S's servicing of one of Technical Aid's customers, constitute violations of Allen's employment contract; (3) whether the liquidated damages clause contained in Allen's contract was enforceable, and, if not,

whether actual damages should be awarded; and (4) whether the passage of time between the submission of the case and the rendering of the court's decision led to inconsistent findings which were prejudicial to Technical Aid.

Technical Aid is in the business of providing temporary and contract professionals to industry. Its one division, Tech/Aid, supplies a variety of technical personnel; a number of wholly-owned subsidiaries provide other specialized technical personnel and clerical workers.

Allen was hired by Technical Aid on or about April 20, 1981. When he first reported for work on April 27, 1981, Allen was told that he was expected to sign an employment contract (the contract) containing a number of restrictive covenants. Allen had not previously been told that he would have to sign such a contract. He wanted to take the contract home and have a lawyer look at it, but he was told that he could not work for Technical Aid without signing the contract immediately. Having already given notice to his previous employer, Allen felt he had no choice but to sign the contract.

The contract contained the following restrictions:

"6. *ACKNOWLEDGEMENT OF CONFIDENTIAL NATURE OF EMPLOYMENT AND GOODWILL INTERESTS OF TECHNICAL AID*

... EMPLOYEE, therefore, agrees that he will not while in TECHNICAL AID'S employ, directly or indirectly, either alone or in association with any other person or firm, engage in any activity whatsoever which is competitive to TECHNICAL AID for himself or in association in any capacity with any other person or firm engaged in a similar business to TECHNICAL AID'S.

7. *AGREEMENT NOT TO ENGAGE IN COMPETITIVE BUSINESS*

EMPLOYEE further agrees that in the event of termination of this Agreement for any reason whatsoever, he will not, for a period of eighteen (18) months from the date of such termination (such period not to include any period(s) of violation or period(s) of time required for litigation to enforce the covenants herein) either directly or indirectly, on his own account or as agent, stockholder, employer, employee or otherwise in conjunction with any other person or entity engage in competition in a business similar to that of TECHNICAL AID located within a radius of one hundred

(100) miles of any office to which he was assigned by TECH-NICAL AID within the preceding year, nor will he solicit accounts, personnel, or engage in any other competitive activities within said area. EMPLOYEE further agrees that regardless of geographic location, he will not, during such time period service any customers TECHNICAL AID has done any business with during the preceding year. . . .

8. *AGREEMENT NOT TO COMPETE FOR ACCOUNTS OR PERSONNEL*

EMPLOYEE further agrees that within said period of eighteen (18) months, as well as the duration of this Agreement, he will not in any way solicit, divert, take away or attempt to solicit, divert or take away any staff, temporary personnel, trade, business or good will from TECHNICAL AID or otherwise compete for accounts or personnel which became known to him through his employment with TECH-NICAL AID and agrees not to influence or attempt to influence any of TECHNICAL AID'S customers or technical personnel not to do business with TECHNICAL AID."

In addition, in paragraph 9 of the contract, Allen agreed not to divulge any confidential information acquired while in the employ of Technical Aid.

After working in Technical Aid's national office for a number of years, Allen was transferred to the Nashua, New Hampshire, office. He was a factor in gaining Seppala & Aho, a construction firm, as a client for Technical Aid. Allen began placing temporary construction workers with Seppala & Aho; however, Technical Aid told him to spend more of his time placing technical workers.

In November, 1985, Technical Aid lost the Sanders Associates account, a major source of income for Allen. Dissatisfied with his prospects for future income, Allen soon thereafter decided to leave Technical Aid. Together with Redmond, who had previously left the employ of Technical Aid, Allen took steps towards forming E & S, a New Hampshire corporation, and entering the temporary personnel business. The certificate of incorporation was issued on March 24, 1986. Allen and Redmond were the sole stockholders, each owning fifty shares of stock. In April, 1986, they arranged for financing and leased office space for E & S.

On May 10, 1986, Allen resigned from Technical Aid. Thereafter, he worked for E & S, participating only in management. He did not solicit or service customers.

On June 26, 1986, Technical Aid filed a petition for a temporary restraining order, preliminary and permanent injunction, and damages. On July 10, 1986, a restraining order was issued against Allen, enjoining him from soliciting, diverting or otherwise contacting any of sixty listed client companies of Technical Aid. The injunction was dissolved in September, 1987. E & S continued to solicit and service Seppala & Aho, one of the listed companies, while the order was in effect and thereafter.

I. *Enforceability of the Covenants*

 This court has stated that "the law does not look with favor upon contracts in restraint of trade or competition." *Dunfey Realty Co. v. Enwright*, 101 N.H. 195, 197, 138 A.2d 80, 82 (1957). Such contracts are to be narrowly construed. *See Home Gas Corp. v. Strafford Fuels, Inc.*, 130 N.H. 74, 80, 534 A.2d 390, 394 (1987). Nonetheless, restrictive covenants are valid and enforceable if the restraint is reasonable, given the particular circumstances of the case. *Smith, Batchelder & Rugg v. Foster*, 119 N.H. 679, 683, 406 A.2d 1310, 1312 (1979). "In determining whether such restriction is reasonable, the court will look alone to the time when the contract was entered into." *Seaboard Industries, Inc. v. Blair*, 10 N.C. App. 323, 331, 178 S.E.2d 781, 786 (1971) (quoting *Rakestraw v. Lanier*, 104 Ga. 188, 194, 30 S.E. 735, 738 (1898)); *accord Cook v. Johnson*, 47 Conn. 175, 178 (1879). The determination of whether a covenant is reasonable is a matter of law for this court to decide. *See, e.g., Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208, 212 (Ind. Ct. App. 1982).

 To determine the reasonableness of a restrictive covenant ancillary to an employment contract, this court employs a three-pronged test: first, is the restriction greater than is necessary to protect the legitimate interests of the employer; second, does the restriction impose an undue hardship on the employee; and third, is the restriction injurious to the public interest? *Smith, Batchelder & Rugg v. Foster supra*; see RESTATEMENT (SECOND) OF CONTRACTS § 188 (1979); Blake, *Employee Agreements Not to Compete*, 73 HARV. L. REV. 625, 648–49 (1960). If any of these questions is answered in the affirmative, the restriction in question is unreasonable and unenforceable.

Paragraphs 7 and 8 of the contract contain a number of restrictive covenants. We will address the enforceability of each in turn.

### A. *Paragraph 7*

The trial court ruled that paragraph 7 of the contract failed all

three prongs of the reasonableness test. Paragraph 7 contains two separate restrictions. The first (the covenant against competition) prohibits Allen, for a period of eighteen months following his termination, from "engag[ing] in competition in a business similar to that of Technical Aid" within 100 miles of any office to which he had been assigned in the preceding year, or "solicit[ing] accounts, personnel, or engag[ing] in any other competitive activities within said area."

██ As a preliminary matter, we find to be in error the trial court's conclusion that "the word 'competition' is so vague in this context that one cannot be sure what would be considered competition." The trial court further opined that the provisions of paragraph 7 are so expansive that they could be "construed to prohibit Allen from even having a job with a business similar to that of the plaintiff." While at least one jurisdiction has held that employers have no legitimate interest in preventing former employees from working for competitors "in any capacity," *see Howard Schultz & Assoc. v. Broniec*, 239 Ga. 181, 185, 236 S.E.2d 265, 268 (1977), this contract does not present such a situation. No such prohibition is explicitly made; nor, as stated above, would we read ambiguous language expansively to imply such a prohibition. *See Dunfey Realty*, 101 N.H. at 197, 138 A.2d at 82. Moreover, in *Logic Assoc's, Inc. v. Time Share Corp.*, 124 N.H. 565, 474 A.2d 1006 (1984), this court, in the context of a covenant not to compete, held that the phrase "in competition with" was "plainly unambiguous." *Id.* at 572, 474 A.2d at 1010. The defendants argue that *Logic Associates* is inapposite because the language in the covenant at issue differs slightly. We find this argument to be meritless. Therefore, we hold that the prohibition of "competition" or "competitive activities" in a restrictive covenant is not so vague as to render the covenant unreasonable *per se*.

██ As stated above, the first step in determining the reasonableness of a given restraint is to identify the legitimate interests of the employer, and to determine whether the restraint is narrowly tailored to protect those interests. Here, Technical Aid's interest derives from Allen's contact with its customers. When an employee is put in a position involving client contact, it is natural that some of the goodwill emanating from the client is directed to the employee rather than the employer. *See Allied Adjustment Serv. v. Heney*, 125 N.H. 698, 701, 484 A.2d 1189, 1191 (1984) (applying Massachusetts Law); Blake, 73 HARV. L. REV. at 654. The employer has a legitimate interest in preventing its employees from appropriating this goodwill to its detriment. 17 C.J.S. *Contracts* § 254, at 1141 (1963); *see,*

*e.g., All Stainless, Inc. v. Colby*, 364 Mass. 773, 779–80, 308 N.E.2d 481, 486 (1974). *See generally* Blake, *supra* at 653–67.

■ For a restrictive covenant based on an employee's client contact to narrowly protect the legitimate interests of the employer, the geographic scope of the restriction generally must be limited to that area in which the employee had client contact, as that is usually the extent of the area in which the employer's good will is subject to appropriation by the employee. Blake, *supra* at 677; *see Rental Uniform Service of Florence v. Dudley*, 278 S.C. 674, 676, 301 S.E.2d 142, 143 (1983); *Wilson v. Chemco Chemical Co.*, 711 S.W.2d 265, 267 (Tex. Ct. App. 1986). For salespersons, this area often corresponds to the territory to which they are assigned to make sales. Blake, *supra* at 660; *see Lawter Intern., Inc. v. Carroll*, 116 Ill. App. 3d 717, 727, 451 N.E.2d 1338, 1345 (1983). As a salesperson in Technical Aid's Nashua sales office, Allen's territory included the entire State of New Hampshire, and possibly Vermont and that part of Massachusetts north of Routes 2 and 495. However, the covenant against competition prohibits Allen from engaging in competition anywhere within a 100-mile radius of the Nashua office. This area includes large portions of Maine, Massachusetts, Rhode Island, and Connecticut. Because Allen could not, as an employee of Technical Aid, solicit business in these regions, it is highly unlikely that he would be able to appropriate any of Technical Aid's goodwill there. Therefore, the geographic limitation is greater than necessary to protect the legitimate interests of Technical Aid, and the covenant against competition fails to meet the first prong of the reasonableness test.

■ For similar reasons, this covenant also fails to meet the second prong of the reasonableness test by imposing an undue hardship on Allen. Where the restriction is greater than necessary to protect the legitimate interests of the employer, any adverse effect caused by that part of the restriction which is unnecessary constitutes an undue hardship on the employee. Here, the covenant against competition, to the extent that it prohibits Allen from engaging in competition with Technical Aid beyond his assigned sales territory, seriously limits Allen's employment opportunities without providing any legitimate benefit to Technical Aid. Thus, this covenant imposes an undue hardship on Allen.

■ Lastly, no evidence was presented that the covenant against competition was injurious to the public interest. Although the restriction does limit the public's ability to choose, the mere fact of

some limitation is not sufficient to constitute injury to the public interest. If it were, no restrictive covenant could be found to be reasonable, as any restriction will curtail to some degree the public's ability to choose. A restrictive covenant must *unreasonably* limit the public's right to choose before it will be found to be injurious to the public interest. *See New Haven Tobacco Co. v. Perrelli*, 11 Conn. App. 636, 639, 528 A.2d 865, 867 (1987). No evidence of such an effect has been presented in this case; nor is there any evidence that Technical Aid threatens to accumulate monopoly power, *see id.* at 641–42, 528 A.2d at 868, despite the defendants' argument to the contrary. Therefore, we cannot find that the covenant against competition is injurious to the public interest.

 Because it violates two prongs of the reasonableness test, we hold that the covenant against competition is unreasonable and unenforceable as written.

The second restrictive covenant found in paragraph 7 of the contract (the covenant against servicing customers) states that Allen will not "service any customers TECHNICAL AID has done business with during the preceding year" for a period of eighteen months after termination, "regardless of geographic location." The activity encompassed by this restriction is considerably less than that of the covenant against competition. Like the covenant against competition, however, the geographic scope of the covenant against servicing customers is greater than is necessary to protect the legitimate interests of Technical Aid. In this covenant, Technical Aid expressly states that there is no geographic limitation on the restricted activity. Nor is there any limitation implied by the circumstances. Technical Aid has clients far outside Allen's allotted territory; indeed, it purports to be not only a national but an international organization. Technical Aid has no legitimate interest in protecting its entire client base from Allen. As to the majority of Technical Aid's customers, Allen has no advantage over any other complete stranger; he has no special hold on their goodwill.

As with the previous covenant, the lack of a legitimate interest behind this covenant means that its restriction imposes an undue hardship on Allen. In addition, this covenant raises the possibility that Allen could violate it without so realizing, because he may very well be unaware of the identities of all of Technical Aid's customers world-wide.

 Although there is no evidence that the covenant against servicing customers is injurious to the public interest, it fails to meet

the first two prongs of the reasonableness test and is, therefore, unenforceable as written.

### B. *Paragraph 8*

Paragraph 8 contains one rather complex and inartfully drawn restrictive covenant. In it Allen agrees not to

"in any way solicit, divert, take away or attempt to solicit, divert or take away any staff, temporary personnel, trade, business or goodwill from TECHNICAL AID or otherwise compete for accounts or personnel which became known to him through his employment with TECHNICAL AID and agrees not to influence or attempt to influence any of TECHNICAL AID's customers or technical personnel not to do business with TECHNICAL AID."

Before analyzing the reasonableness of this covenant, we must address several issues of construction. "[T]he meaning of a contract is ultimately a matter of law for this court to decide." *Restaurant Operators, Inc. v. Jenney*, 128 N.H. 708, 710, 519 A.2d 256, 258 (1986). First, it is unclear whether the clause "which became known to him" is a limitation on all or only some of the restrictions of the covenant. Noting again our policy of strictly construing restrictive covenants, *see Dunfey Realty*, 101 N.H. at 197, 138 A.2d at 82, we conclude that the clause "which became known to him" at least impliedly pertains to all of the restrictions of paragraph 8.

Second, the meaning of the clause "which became known to him" must be ascertained. In this case, "which became known to him" is subject to two possible interpretations. First, it could mean "of whose existence he first learned." The trial court apparently adopted this interpretation. It found no violation of paragraph 8 because Seppala & Aho was "known" to Allen prior to his employment at Technical Aid. According to the record, Allen's "knowledge" was limited to having seen roadside signs at Seppala & Aho's construction sites. Therefore, the trial court must have equated "which became known to him" with "of whose existence he first learned."

However, it seems doubtful that the parties to the contract intended such an interpretation, which on the whole leads to nonsensical results. On this interpretation, any business that Allen first heard of outside his employment with Technical Aid would be exempt from the restrictions of paragraph 8. On the other hand, the restrictions of paragraph 8 could become applicable at the mere mention of a company in the workplace. The result would be restrictions of almost

random application, without reference to the interests of the parties to the contract.

The other possible interpretation of "which become known to him" would be "of which he gained a significant understanding." Such an interpretation is in accord with definition 1(a)(1) of the verb "to know" in Webster's Third New International Dictionary (1961): "to have perception, cognition, or understanding of esp. to an extensive or complete extent." This interpretation makes better sense from the standpoint of the parties by making the restrictions of paragraph 8 reasonable, as we discuss, *infra*. On the other hand, as the clause was interpreted by the trial court, the lack of any relation to the legitimate interests of Technical Aid renders the restrictions of paragraph 8 unreasonable. In addition, our own rules of construction prohibit us from interpreting a contract so as to make it illegal when there is an obvious interpretation which would give it legal effect. *Wessman v. Railroad*, 84 N.H. 475, 478, 152 A. 476, 478 (1930). Therefore, we hold that the clause "which become known to him" in paragraph 8 of the contract requires that Allen must have gained some kind of significant knowledge or understanding of the entity concerned beyond the mere knowledge of its existence.

Having determined the meaning of paragraph 8, we must now determine whether its restrictions are reasonable and therefore enforceable. First, we find that the restrictions of paragraph 8 are no greater than necessary to protect the legitimate interests of Technical Aid.

The restrictions on Allen's activities regarding Technical Aid's customers known to Allen through his employment are no greater than necessary. These restrictions will most often be applicable where Allen has had contact with the customer in question; as discussed above, Technical Aid may enforce otherwise reasonable restrictions which prevent Allen from doing business with such customers in order to protect its goodwill.

Paragraph 8 will also apply as to customers with whom Allen has had no contact, if they have "become known" to him through his employment. Here, too, Technical Aid has a legitimate interest to protect. When Allen has gained extensive knowledge of a customer through his employment, Technical Aid has a legitimate interest in preventing Allen from using that knowledge to Technical Aid's detriment.

As to the restrictions regarding its own staff, Technical Aid certainly has a legitimate interest in retaining the services of its current

employees about whom an ex-employee has become knowledgeable. To hold otherwise would be to encourage employers to limit the contacts between its employees, thereby reducing the employers' vulnerability to former employees' recruiting away current employees.

The trial court made no explicit ruling as to the reasonableness of the eighteen-month duration of the restrictions in paragraph 8. Technical Aid asserts that this time period was necessary for Allen's replacement to "redevelop rapport" with those clients with whom Allen had contact. The defendants counter that Allen not only developed a rapport with Seppala & Aho within a year's time, but also "worked" the account for over a quarter of a million dollars. Thus, the defendants imply that eighteen months was not necessary. However, their argument ignores the possibility that the initial developing of a rapport with a client is easier when there is not an alternative supplier who is the beneficiary of pre-existing goodwill of that client. Technical Aid, in effect, seeks a time period for the goodwill owed it, but directed to Allen, to dissipate. We cannot say that this period is excessive.

The defendants contend that enforcement of the restrictive covenants found in the contract would impose an undue hardship on Allen. As to paragraph 8, we disagree. The defendants argue that enforcement of the covenants will have a disproportionate effect on Allen. They point to figures showing the importance of the Seppala & Aho account relative to the total business done by Technical Aid and E & S.

Disproportionate hardship is regarded as a reason for refusing remedies, both equitable and legal. *Smith, Batchelder & Rugg,* 119 N.H. at 684, 406 A.2d at 1313; 6A A. CORBIN, CORBIN ON CONTRACTS § 1394 (1951). However, disproportionate hardship is not evident here. To determine whether hardship is disproportionate, the consequences to the employer if the covenant is held invalid should be compared with the consequences to the employee if the covenant is held valid. *Arthur Murray Dance Studios of Cleveland v. Witter,* 105 N.E.2d 685, 699 (Ohio Ct. C.P. 1952). Contrary to the defendants' argument, the relative sizes of Technical Aid and E & S are not relevant. As we stated at the outset, the proper question is whether the covenant was reasonable when signed, at which time E & S did not exist. *See Cook v. Johnson,* 47 Conn. at 178 ("if [the covenant] is reasonable when made, subsequent circumstances . . . do not affect its operation"). Even ignoring this, the test espoused by the defendants leads to absurd results, especially where former employees go

into business for themselves. First, it effectively prohibits any large business from enforcing restrictive covenants, as business taken by an employee will almost invariably have a greater impact on that employee. Second, it encourages former employees who violate a restrictive covenant to do so to the greatest extent possible, for this would make the enforcement of the covenant more of a hardship on them, and thus the covenant less likely to be enforced.

The consequences to Technical Aid if the covenant is not enforced are not negligible. Allen would be free to use knowledge gained while working at Technical Aid to steal or drive away its customers, staff, and technical personnel. This could cause significant loss of revenues to Technical Aid. In addition, the long-term effect to Technical Aid of not being able to protect its legitimate interests sufficiently could be severely damaging. All of Technical Aid's business would be at risk to former employees. Thus, Technical Aid would have a disincentive to provide the optimal level of training, information, and client contact to its employees. *See generally Consultants & Designers v. Butler Service Group*, 720 F.2d 1553, 1559–60 (11th Cir. 1983). The resulting loss of efficiency would be detrimental to the public interest as well as to Technical Aid.

The consequences to the employee of enforcement of the covenant depends on the employee's prospects for future employment. "An employer 'has no right to unnecessarily interfere with the employee's following any trade or calling for which he is fitted and from which he may earn his livelihood. . . .'" *Dunfey Realty*, 101 N.H. at 199, 138 A.2d at 83 (quoting *Roy v. Bolduc*, 140 Me. 103, 107, 34 A.2d 479, 481 (1943)). The defendants argue that the covenant against competition found in paragraph 7 does just that, preventing Allen from earning a living throughout most of New England. However, paragraph 8 restricts Allen's activity to a much lesser degree than does the covenant against competition in paragraph 7. Paragraph 8 does not prevent Allen from opening a directly competitive business across the street from Technical Aid. What it does prohibit is certain conduct in regard to those personnel and accounts of Technical Aid which became known to Allen through his employment. Such a prohibition certainly may have some impact on Allen's employment, but it does not require that Allen leave the trade of technical personnel placement within any geographic area.

In any case, there is no indication that Allen's skills were so specialized as to prevent him from obtaining employment in another field upon leaving Technical Aid. Indeed, the defendants' own arguments support this conclusion. First, the defendants contend that

enforcement of the restrictive covenants will prevent Allen from utilizing the skills and experience he gained prior to joining Technical Aid. However, that experience was not directly in the technical placement field. Therefore, not only is Allen not prevented from utilizing that experience, but that experience makes less compelling the argument that enforcement of the covenants will render him unable to provide for himself and his family. Second, Allen testified that he has been involved only in the *management* of E & S, not in any placement or solicitation of business. Thus, he has used his generalized business skills, which would surely be useful in many business settings.

Balancing these potential consequences, we are unable to conclude that paragraph 8 imposes a disproportionate hardship on Allen. Nor does our holding in *Smith, Batchelder & Rugg* require such a conclusion. There, the covenant in question was found to be greater than necessary to protect the interest of the employer. 119 N.H. at 683, 406 A.2d at 1312–13. Citing *Dunfey Realty*, 101 N.H. 195, 138 A.2d 80 (1957), we stated that an employer may not "unnecessarily interfere" with an employee's right to work. *Smith, Batchelder & Rugg*, 119 N.H. at 684, 406 A.2d at 1313. Implicit in our discussion was the fact that it was the overbreadth of the restrictions which rendered the interference unnecessary. If we had enforced the covenant, the former employees would have suffered considerable hardship as to the covenant's entire extent. On the other hand, the employer only suffered a hardship as to a part of the restriction due to our refusal to enforce the covenant; to the extent that the covenant was greater than necessary to protect its legitimate interests, the employer suffered no hardship whatsoever. Thus, the hardship involved in *Smith, Batchelder & Rugg* was disproportionate.

 Such is not the case with paragraph 8 of the contract at issue here. Because the restrictions of paragraph 8 are no greater than necessary to protect the legitimate interests of Technical Aid, there is no unnecessary interference with Allen's right to work. Therefore, the analysis used in *Smith, Batchelder & Rugg* is not controlling.

 As for the third prong of the reasonableness test, there is nothing on the record which suggests that enforcing paragraph 8 would unreasonably limit the public's right to choose, or tend to create monopoly power. Therefore, we find paragraph 8 not to be injurious to the public interest. Because paragraph 8 passes all three prongs of the reasonableness test, we find it to be reasonable and, in itself, enforceable.

## C. *Paragraph 6*

As a final matter, we must address the restrictions of paragraph 6. Technical Aid appeals the trial court's finding that paragraph 6 has not been violated. The trial court did not explicitly rule on the reasonableness of paragraph 6, and the defendants do not contend that paragraph 6 is unenforceable. However, before addressing the issue of possible violations of paragraph 6, we must first determine if it is reasonable and enforceable.

Paragraph 6 prohibits Allen from engaging in activity competitive to Technical Aid while in its employ. The legitimate interests of an employer in enforcing a restrictive covenant are considerably stronger during the employee's term of employment than subsequent to it. Employers are entitled to require undivided loyalty from their present employees. Such a restriction is not a hardship to the employee, who by definition is not being prevented from plying his or her trade, nor is it injurious to the public interest. *Harrison v. Glucose Sugar Refining Co.*, 116 F. 304, 310 (7th Cir. 1902). Therefore, we find that the restrictions found in paragraph 6 are reasonable and enforceable.

## D. *Effect of Unenforceable Provisions*

Having found that the restrictive covenants contained in paragraphs 6 and 8 are reasonable and, if considered separately, enforceable, we must determine what effect the unenforceability of the provisions of paragraph 7 has. Like other agreements against public policy, contracts which unreasonably restrain trade are void and unenforceable. *See Meredith v. Fullerton*, 83 N.H. 124, 133, 139 A. 359, 364 (1927); 17 AM. JUR. 2d *Contracts* § 174 (1964). Therefore, we will not enforce paragraphs 6 and 8 of the contract unless the defects of paragraph 7 are cured or that paragraph is properly severed from the remainder of the contract. There are a number of methods by which this may be done, with varying prerequisites for their application. One possibility is that the unenforceable provisions may be partially enforced. A court may partially enforce an overly broad restrictive covenant if it finds that the employer acted in good faith in the execution of the contract. *Smith, Batchelder & Rugg*, 119 N.H. at 685, 406 A.2d at 1311; RESTATEMENT (SECOND) OF CONTRACTS § 184(2), at 30 (1979). Here, this would allow, in addition to the enforcement of paragraphs 6 and 8, the enforcement of paragraph 7 to the extent reasonable. However, the trial court found that Technical Aid did not act in good faith in the execution of the contract with Allen.

This finding was evidently based on Technical Aid's presentation of the contract to Allen on his first day of employment, after Allen had given notice to his previous employer in reliance on an oral agreement with Technical Aid, and on Technical Aid's insistence that he sign the contract immediately. These facts closely track those in *Smith, Batchelder & Rugg*, where we upheld a master's denial of a finding of good faith on the part of the employer. 119 N.H. at 681, 685, 406 A.2d at 1311, 1313–14. Therefore, we cannot say the trial court here erred in its finding of lack of good faith or its refusal to partially enforce paragraph 7.

■ An alternative to partial enforcement is severance of the whole of paragraph 7, and enforcement of the remainder of the contract, including paragraphs 6 and 8. Enforceable terms of a contract may be given effect if the unenforceable terms are not essential to the agreed exchange, and if the party seeking enforcement has not engaged in serious misconduct. RESTATEMENT (SECOND) OF CONTRACTS § 184(1) (1979). Our cases discussing the severability of contracts have usually referred only to the standard of "divisibility," which requires that the parties' promises and considerations be capable of apportionment, so that each promise and its corresponding consideration is analogous to a separate contract. *See, e.g., Park v. Manchester*, 96 N.H. 331, 334, 76 A.2d 514, 516 (1950); *Lemire v. Haley*, 91 N.H. 357, 359–60, 19 A.2d 436, 439–40 (1941). This standard corresponds to that set forth in section 183 of the Restatement. However, there is also support in our case law for the standard set forth in section 184(1). In *Piper v. Railroad*, 75 N.H. 435, 75 A. 1041 (1910), the issue before this court was also the enforceability of an employment contract. One promise of the employee, to waive any claim for damages from an injury resulting from the negligence of the employer's servants, had previously been held valid. *Id.* at 436, 75 A. at 1043. A second promise, which purported to exempt the employer from the consequences of its own negligence, was held to be unenforceable. *Id.* In holding that the first promise remained enforceable despite the second, invalid one, this court stated: "Where the [employee] has received the consideration in full for the doing of two things, no ground appears in reason why, if the law will excuse him from the performance of one, he should for that reason alone also be released from the other promise." *Id.* at 438, 75 A. at 1044. While inconsistent with the "divisibility" standard, this reasoning is consistent with section 184(1) of the Restatement. Where one who has given consideration in full seeks to enforce a legal promise, it

cannot be said that a second, unenforceable promise is "an essential part of the agreed exchange." RESTATEMENT (SECOND) OF CONTRACTS § 184(1), at 30 (1979).

Whether the standards of section 184(1) apply, or rather those of section 184(2), which allows for partial enforcement of a term only on a finding of good faith in the execution of the contract, depends upon whether multiple terms are involved or only one. This determination is made based on both the substance of the agreement and its language. RESTATEMENT (SECOND) OF CONTRACTS § 184 comment b, at 31 (1979).

 Despite the lack of an explicit severability provision, the different nature of the various restrictions of the contract, together with their placement in separate paragraphs, suggests that paragraph 7 should be considered a separate term. *See Seaboard Industries*, 10 N.C. App. at 337, 178 S.E.2d at 789–90. Although the content of paragraph 7 is related to that of paragraph 8, it is not so related as to require them to be considered a single term. Thus, we find paragraphs 6, 7, and 8 are each separate terms. In addition, while not showing good faith, Technical Aid's actions in this case did not rise to the level of "serious misconduct." RESTATEMENT (SECOND) OF CONTRACTS § 184(1), at 30 (1979). Therefore, the criteria of section 184(1) of the Restatement are satisfied, and paragraphs 6 and 8 may be enforced despite the existence of unenforceable paragraph 7. This holding is in accord with *Piper*.

We are not unmindful of the dangers of employers' attempting to impose overly broad restrictions on employees. However, neither may we ignore the legitimate interests of employers in protecting their goodwill. In addition, nothing in this decision prevents us from ruling that an employer who has purposefully overreached, creating multiple covenants sharing the same subject matter but of slightly varying scope, is guilty of "serious misconduct," barring severance under section 184(1) of the Restatement.

## II. *Violations of Covenants*

Having determined that paragraphs 6 and 8 of the contract are enforceable, we must now address the issue of whether the defendants violated the provisions thereof. The trial court ruled that the incorporation of E & S, and the attendant financial and leasing arrangements undertaken by Allen and Redmond, all of which took place while Allen was employed at Technical Aid, did not constitute competition with Technical Aid in violation of paragraph 6. Rather,

the court found that these actions were "merely in preparation" for Allen's departure from Technical Aid. However, the court's ruling completely ignored Allen's explicit testimony that Redmond also began to solicit business for E & S "a long time" before Allen left Technical Aid.

The trial court held that solicitation by Redmond constituted solicitation by Allen under the wording of the contract. Under the circumstances of this case, we agree with the trial court that the language of the contract makes Allen responsible for the actions of Redmond. *See Gosselin v. Archibald*, 121 N.H. 1016, 1022, 437 A.2d 302, 307 (1981). Certainly, given the activities of Allen and Redmond, E & S was doing business while Allen was working for Technical Aid. *See Allied Adjustment Serv.*, 125 N.H. at 702, 484 A.2d at 1192 (applying Massachusetts law). Therefore, if the business of E & S was competitive with that of Technical Aid, Allen violated paragraph 6 of the contract.

 The trial court found, and the defendants strenuously argue, that E & S has never been in a business similar to that of Technical Aid, and therefore has never been in competition with it. The basis for this argument is that E & S places exclusively construction laborers, whereas Technical Aid places primarily technical personnel. However, we find this argument to be semantic at best. The defendants maintain that placing construction temporaries is not "an established part" of Technical Aid's business. But this argument implies that the placement of construction temporaries *is* a part of Technical Aid's business, albeit one which is not firmly established. Allen himself testified that Technical Aid was "certainly glad to take the business" of placing construction workers with Seppala & Aho. E & S need not challenge Technical Aid across the board to be competing with Technical Aid for business; that Technical Aid's penetration of the construction temporaries market is small, or even embryonic, cannot negate E & S's competition. Where, as here, one company replaces another as a supplier of a given service to a specific customer, we think it defies logic to assert that competition is not involved. Therefore, we find that Allen violated paragraph 6 of the contract.

In paragraph 8 of the contract, Allen specifically agreed not to "divert or take away any . . . business . . . or otherwise compete for accounts . . . which became known to him through his employment." Nonetheless, the trial court held that Allen did not violate paragraph 8. The court offered two grounds for its conclusion. First it found

that Seppala & Aho was known to Allen apart from his employment. Second, the court stated that "the thrust of the agreement was to prevent Allen from engaging in competition in a business similar to that of [Technical Aid]." Because the court found that Technical Aid and E & S were not in similar businesses, it found no violation of paragraph 8. We hold this to be in error.

First, the only evidence on the record of Allen's outside knowledge of Seppala & Aho is that he saw Seppala & Aho signs while driving. Such limited contact could not result in the significant understanding necessary to consider Seppala & Aho to have "become known" to Allen outside of his employment. On the other hand, Allen's relationship with Seppala & Aho as the representative of Technical Aid is precisely the sort of contact to which this provision was meant to apply. Therefore, we find that Seppala & Aho "became known" to Allen through his employment at Technical Aid.

██ ██ Neither is the second basis of the court's reasoning sound. While it is true that paragraph 6 uses the language "similar business" and paragraph 7 uses the language "business similar," paragraph 8 makes no reference at all to such a concept. A court may not add language to a contract so that it will be more consistent with the court's view of the contract's "thrust." *See Gosselin*, 121 N.H. at 1022, 437 A.2d at 307. Nothing in the contract suggests that the parties intended such a limitation to be implied into paragraph 8. Indeed, the absence of any "similar business" language in paragraph 8 suggests the opposite. Therefore, because Seppala & Aho became known to Allen through his employment at Technical Aid, and because he competed for and successfully diverted its business, Allen violated paragraph 8 of the contract.

## III. *Damages*

Having decided that Allen violated enforceable provisions of the contract, we must now address the damages available to Technical Aid. In paragraph 13 of the contract, Allen agreed, should he breach,

> "to forfeit all existing and future rights to remuneration hereunder whether direct or indirect, including but not limited to commissions earned but not yet paid, and any so-called fringe benefits, including severance pay where applicable . . . [and pay] an amount equal to the gross profit, or twenty-five (25%) percent of the sales, whichever is greater, resulting from business generated by [Allen] either directly or indirectly . . . through soliciting or otherwise competing

> for accounts or personnel which became known to him through his employment with TECHNICAL AID."

Paragraph 13 represents an attempt by Technical Aid to liquidate damages in the event of a breach by Allen.

 To be enforceable as liquidated damages, a provision for the payment of a stipulated sum must pass a three-part test: first, it must have been anticipated at the time of formation of the contract that potential damages would be difficult to prove; second, the parties must have intended to liquidate damages in advance; and third, the amount stipulated must be a reasonable one. *Realco Equities, Inc. v. John Hancock Mut. Life Ins. Co.*, 130 N.H. 345, 350–51, 540 A.2d 1220, 1223–24 (1988). Failure to meet all three prongs of this test will result in the provision's being unenforceable as a penalty. *See id.*

The trial court stated that the damages stipulated in paragraph 13 "seem[] unduly harsh," and ruled that the provision was an unenforceable penalty. While we reach the same result, we do so on different grounds.

 A number of courts have found it to be difficult to accurately estimate the harm incurred by one business from the competition of another. However, most of these cases involve competition among businesses which cater to the general public. *See Mayhall v. Proskowetz*, 537 S.W.2d 320 (Tex. Civ. App. 1976) (hearing aid sales); *Bauer v. Sawyer*, 8 Ill. 2d 351, 134 N.E.2d 329 (1956) (medical practice); *Management, Inc. v. Schassberger*, 39 Wash. 2d 321, 235 P.2d 293 (1951) (laundry and dry cleaning business); *Mead v. Anton*, 33 Wash. 2d 741, 207 P.2d 227 (1949) (restaurant); *Canady v. Knox*, 43 Wash. 567, 86 P. 930 (1906) (butchering business); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 356, illustration 2 (1979) (veterinary practice). In such cases, a significant proportion of the loss, if not all, will be the loss of unknown or potential customers. On the other hand, where the loss complained of relates to a specific client, proof of damages is considerably easier. The injured party may point to the history of revenues generated by the client, both for the injured party and for its competitor after the breach of contract. Indeed, in this case Technical Aid has been quick to offer its claim as to actual damages. The cases which have found damages to be uncertain where the loss of specific clients is concerned have not addressed this distinction. *See Holloway v. Faw, Casson & Co.*, 319 Md. 324, 354–55, 572 A.2d 510, 525 (1990) (loss of accounting firm's clients); *Knight,*

*Vale and Gregory v. McDaniel*, 37 Wash. App. 366, 371–72, 680 P.2d 448, 453 (1984) (same). Thus, we hold that where the damage complained of is the loss of a part or the whole of a specific client's business, such damages, absent additional factors, are not sufficiently difficult to prove to support a claim for liquidated damages.

■ Here, "the damages do not appear to us to be so far incapable of accurate estimation," *Langlois. v. Maloney*, 95 N.H. 408, 414, 64 A.2d 697, 702 (1949), to pass the first prong of the test for liquidated damages. Therefore, we hold paragraph 13 to be an unenforceable penalty.

■ Where stipulated damages have been held to be a penalty, the plaintiff may recover actual damages. *Garrett v. Coast & Southern Federal Sav. & L. Ass'n*, 9 Cal. 3d 731, 741, 511 P.2d 1197, 1203, 108 Cal. Rptr. 845, 851 (1973); *see Hayes & Swift, Inc. v. Sabia Const. Co.*, 126 N.H. 81, 83, 489 A.2d 107, 108 (1985). "The plaintiffs are to be compensated for all such damages, if they are capable of computation." *Salinger v. Salinger*, 69 N.H. 589, 591, 45 A. 558, 559 (1899). Because the trial court did not make findings which allow us to compute actual damages, we remand for a new trial on that issue alone.

IV. *Conclusion*

■ Paragraphs 6 and 8 of the contract are enforceable, notwithstanding the unenforceability of paragraph 7. Allen violated both paragraph 6 and paragraph 8. The damages stipulated in paragraph 13 are unenforceable, but we remand for a new trial on the issue of actual damages. Because of the above holdings, we need not reach Technical Aid's fourth issue on appeal, whether the passage of time between the submission of the case and the rendering of the trial court's decision led to inconsistent findings which were prejudicial to Technical Aid.

*Affirmed in part; reversed in part; remanded.*

All concurred.