Kohl v. Manchester, NH                    CV-03-162-M    10/30/03
                    UNITED STATES DISTRICT COURT

                       DISTRICT OF NEW HAMPSHIRE


Kohl Partners, LLC; Symmes
Maini & McKee Associates,
Inc.; and J.T. Callahan
Construction, Inc.,
        Plaintiffs

        v.                                  Civil No. 03-162-M
                                            Opinion No. 2003 DNH 188
City of Manchester,
        Defendant


                          O R D E R

        A disappointed competitor complains that awarding a public

works contract to a rival who submitted a lower-cost proposal is

against public policy.  Plaintiffs (sometimes referred to

collectively as "Kohl"), jointly submitted an unsuccessful

contract proposal to the City of Manchester ("the City"), and now

sue for a declaratory judgment voiding the City's contract with

the successful bidder, intervenor Gilbane Building Company

("Gilbane") (Count II).[1]  Plaintiffs also assert claims of

promissory estoppel (Count III), breach of the covenant of good

_____

        [1] Because the contract at issue has already been awarded,
plaintiffs recognize that their request for injunctive relief to
block the award (Count I) is moot.  (Pl.'s Mem. of Law Supp. Obj.
to Mot. to Dismiss, at 4-5.)

faith and fair dealing implicit in every New Hampshire contract (Count IV), bad faith (Count V), quantum meruit (Count VI), unjust enrichment (Count VII), negligent misrepresentation (Count VIII), and breach of contract (IX).  Before the court are motions to dismiss for failure to state a claim upon which relief can be granted, filed by the City and Gilbane.


## Standard of Review

A motion to dismiss for "failure to state a claim upon which relief can be granted," FED. R. CIV. P. 12(b)(6), requires the court to conduct a limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  When considering a motion to dismiss under FED. R. CIV. P. 12(b)(6), the court must "accept as true all well-pleaded allegations and give plaintiffs the benefit of all reasonable inferences."  Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999) (citing Gross v. Summa Four, Inc., 93 F.3d 987, 991 (1st Cir. 1996)).  However, while a court "deciding a motion to dismiss under Rule 12(b)(6) . . . must take all well-pleaded facts as true . . . it need not credit a

complaint's 'bald assertions' or legal conclusions." Shaw v.
Digital Equip. Corp., 82 F.3d 1194, 1216 (1st Cir. 1996) (quoting
Wash. Legal Found. v. Mass. Bar Found., 993 F.2d 962, 971 (1st
Cir. 1993)). Finally, "[d]ismissal under Fed.R.Civ.P. 12(b)(6)
is only appropriate if the complaint, so viewed, presents no set
of facts justifying recovery." Cooperman, 171 F.3d at 46 (citing
Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 16 (1st Cir.
1989)).

## Background

The relevant facts, as drawn from plaintiffs' complaint, the
City's Request for Proposals ("RFP"), and the written decision
rendered by the City's Selection Committee in response to a
formal protest filed by Kohl,[2] are as follows.

---

[2] "Ordinarily, a court may not consider any documents that
are outside of the complaint, or not expressly incorporated
therein, unless the motion is converted into one for summary
judgment." Alternative Energy, Inc. v. St. Paul Fire & Marine
Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001) (citing Watterson v.
Page, 987 F.2d 1, 3) (1st Cir. 1993)). However, under the
circumstances of this case, the RFP and the Selection Committee
decision qualify as documents "whose authenticity is not
challenged" and that have "'merge[d] into the pleadings'" such
that "the court may properly consider [them] under a Rule
12(b)(6) motion to dismiss." Alternative Energy, 267 F.3d at 33
(quoting Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17
(1st Cir. 1998); Clorox Co. P.R. v. Proctor & Gamble Commercial

3

On February 12, 2002, the City enacted an ordinance establishing a special purchase procedure for the Manchester Schools Improvement Project (hereinafter "the ordinance"). (Def.'s Mot. to Dismiss, Ex. B.)  The ordinance provides, in pertinent part:

> That notwithstanding the provisions of any other ordinance, the City may enter into competitive negotiations with contractors for design/build services with options to finance and operate the Manchester Schools Improvements Project.  This ordinance is a trial establishment of a special purchase procedure as allowed by the Charter.
>
> The City may in lieu of bidding the project enter into competitive negotiations with contractors for the particular service desired providing:
>
> . . .
>
> > c.    The City, through the Highway Department, shall develop the Request For Proposals for the Manchester Schools Improvements Project.
> >
> > d.    Requested proposals and negotiations from all contractors will be based on the same scope of services defined in the Request For Proposals for the purpose of evaluation and selection.
> >
> > . . .
> >
> > f.    All solicitations, negotiations and selections shall be documented.

_Co._, 228 F.3d 24, 32 (1st Cir. 2000)).

4

> g. Project award shall be made based on demonstrated competence and qualifications to provide the required services at a fair and reasonable price.

(Def.'s Mot. to Dismiss, Ex. B.)

The Request for Proposals, dated September 23, 2002, is a fifty-five page document that includes the following relevant provisions. In a portion of Section 1 titled "Unsolicited Alternatives," the RFP provides:

> . . . The City is willing to entertain and encourages the proposal of alternates to those requirements contained herein. These will be considered as part of the final selection process. Alternatives should be clearly detailed and provide cost ramifications on an item by item basis. Alternatives may include, but are not limited to: locations and/or layouts of school additions, substitution of materials and methods, facility reprogramming[,] <u>funding mechanisms not previously approved</u>, methods of insurance and bonding, etc.

(Def.'s Mot. to Dismiss, Ex. A at 10 (emphasis added).)

In that portion of Section 3 titled "City Rights," the RFP provides:

5

. . . The City reserves the right, in its sole
discretion, to:

. . .
• cancel, modify or withdraw the entire RFP;
• modify the RFP process;
. . .
• accept other than the lowest priced Proposal;
• waive deficiencies, informalities and minor
irregularities in Proposals; and
• request supplements to a Proposal.

(Def.'s Mot. to Dismiss, Ex. A at 11.)  Section 3 further

provides:

The RFP does not commit the City to enter any
agreement, nor does it obligate the City to pay for any
costs incurred in preparation and submission of a
Proposal for phase 1 or in anticipation of such an
agreement.  By submitting a Proposal, a Team disclaims
any right to be paid for such costs for phase 1 and for
phase 2, except with respect to phase 2 proposals as
provided in **Section 6.**

(Def.'s Mot. to Dismiss, Ex. A at 12.)

Section 4A of the RFP, titled "Ownership of Submitted

Proposals," provides:

The proposals and all materials and other documents
submitted with such proposals and all supplementary
materials submitted in connection with any
clarification of any submitted proposal and in
connection with the negotiation of any proposal with

6

the City (collectively, "Proposal Materials") shall upon submittal become the absolute property of the Owner [the City] and may be used by the Owner in connection with the Project and for such other purposes as the City may choose without engaging the Proposer for the Project and without any compensation therefore being paid to the Proposer.  The Proposer understands that in submitting its Proposal Materials to the City, the Proposer is delivering all such materials to the City in consideration of a potential award of a contract for the Project.  The Proposer in doing so agrees that it has received such consideration and other good and valuable consideration sufficient to transfer all right, title and interest in and to the Proposal Materials to the Owner who shall have and retain all copyright, trademark, other intellectual property and other intangible rights, and all ownership, right, title and interest in and to the Proposal Materials.

(Def.'s Mot. to Dismiss, Ex. A at 22.)


Section 6 of the RFP includes the following relevant descriptions of the selection process:

After evaluation of the proposals received in response to the RFP, the City intends to engage in individual discussions and interviews with those candidates who, in the sole opinion of the City, have fully and adequately responded to the RFP. . . .

. . . If the City determines that only one candidate is fully qualified, <u>or that one offer is clearly more highly qualified and suitable than any other under consideration, then a contract may be negotiated and awarded to that candidate without any further consideration of the other proposals</u>.

7

(Def.'s Mot. to Dismiss, Ex. A at 30 (emphasis added).)  Section

6 also discusses reimbursement of proposal preparation costs:

> Prior to commencing Phase 2 of the selection process
> the City <u>intends to seek from the Board of Mayor and
> Aldermen and establish an available reimbursement fund</u>
> to provide reimbursement to Phase 2 proposers in two
> circumstances.  <u>Such reimbursement fund, in the amounts
> determined by the City and expected to be announced
> prior to solicitation of Proposals for Phase 2,</u> would
> be available;
>
> (i)   to reimburse certain of the proposers' costs up to
>       a maximum amount to be set by the City in the
>       event that at the end of Phase 2 the City chose
>       not to enter into any contract for the Work with
>       either proposer and
> (ii)  to reimburse certain of the costs, up to a maximum
>       amount to be set by the City, of the proposer who
>       was not selected at the end of Phase 2 (if the
>       other proposer is selected and awarded the DB
>       Contract for the work).  The amount in clause (ii)
>       once announced by the City would be financed and
>       paid as part of the cost of the project.  Such
>       reimbursement cost is to be included in the GMP
>       [guaranteed maximum price] proposed for the second
>       phase by all candidates.

(Def.'s Mot. to Dismiss, Ex. A at 31 (emphasis added).)


Finally, Section 10 of the RFP "sets forth the <u>exclusive</u>

protest remedies with respect to the RFP."  (Def.'s Mot. to

8

Dismiss, Ex. A at 40 (emphasis added).) The protest provision provides:

> Each Proposer, by submitting its Proposal, expressly recognizes the limitation on its right to protest contained herein, expressly waives all other rights and remedies, and agrees that the decision on any protest, as provided herein, shall be final and conclusive. These provisions are contained in the RFP expressly in consideration for such waiver and agreement by the Proposers. Such waiver and agreement by each Proposer are also consideration to each other Proposer for making the same waiver and agreement.

(Def.'s Mot. to Dismiss, Ex. A at 40.) Section 10 then sets out both a pre-proposal procedure for protesting "the terms of the RFP on grounds that any aspect of the procurement process described herein is contrary to legal requirements applicable to this procurement" and a post-award procedure for protesting "any determination of any award of the D-B Contract." (Def.'s Mot to Dismiss, Ex. A at 40 (emphasis added).)

Under the pre-proposal procedure, "[p]rotests regarding [the terms of] the RFP shall be filed as soon as the basis for protest is known to the Proposer, but in no event later than thirty (30) days before the Proposal Delivery Date." (Def.'s Mot. to Dismiss, Ex. A at 40.) Section 10 further provides that

9

> [t]he failure of a Proposer to raise a ground for a
> protest regarding the RFP Documents shall preclude
> consideration of that ground in any protest of a
> selection unless such ground was not and could not have
> been known to the Proposer in time to protest prior to
> the final date for such protests.

(Def.'s Mot. to Dismiss, Ex. A at 40.)

Section 10 also establishes the format for protests. For protests of the terms of the RFP, "[n]o hearing will be held on the protest, but it shall be decided on the basis of the written submissions by the Owners' Representative, whose decision shall be final and conclusive." (Def.'s Mot. to Dismiss, Ex. A at 40). For protests of the award, "[u]nless otherwise required by law, no evidentiary hearing or oral argument shall be provided, except, in the sole discretion of the Owners' Representative, a hearing or argument may be permitted." (Def.'s Mot. to Dismiss, Ex. A at 41.)

In response to the RFP, both Gilbane and Kohl submitted proposals for Phase 1. During the proposal preparation period, the City assured Kohl that "price would not be the sole factor in the City's award of the Project." (Am. Compl. ¶ 13.) The City

10

also represented to Kohl that it would be reimbursed for the costs of proposal preparation if its proposal was unsuccessful.[3] (Am. Compl. ¶ 14.) Gilbane's Phase 1 submission contained material deviations from the requirements of the RFP, and the City did not inform Kohl of those deviations or that it would accept non-compliant proposals. (Am. Compl. ¶ 17.) Gilbane also submitted several supplements to its Phase 1 proposal, outside the RFP process. (Am. Compl. ¶¶ 18-20.) Kohl was not told that Gilbane had made those supplemental submissions, and was not told that the City would accept such submissions. (Am. Compl. ¶¶ 19, 21.) "[N]either of the two Phase 1 proposals was selected or acted upon by the City [and] [t]he City did not make any award based on the Phase 1 proposals." (Def.'s Mot to Dismiss, Ex. E at 1.)

Both Gilbane and Kohl submitted Phase 2 proposals on February 14, 2003. (Am. Compl. ¶ 24.) Gilbane's Phase 2

_____

[3] Plaintiffs do not, however, identify any particular City official who made such a representation, nor do they state the manner in which any such representation was made. Plaintiffs also do not allege that the City actually received funds for reimbursement from the Board of Mayor and Aldermen and did not pay them out, or, alternatively, that the City failed to request such funds.

11

proposal contained a material deviation from the RFP.[4] (Am. Compl. ¶ 25.) The "City never objected to this material deviation, and did not inform Kohl that the City would accept such a deviation from Kohl." (id.) The City also did not mention that there was a significant price difference between the two proposals. (Am. Compl. ¶ 27.) After receiving the two Phase 2 proposals, the City scheduled negotiating sessions with Gilbane (March 4, 2003) and Kohl (March 6, 2003). (Am. Compl. ¶ 27.) After negotiating with Gilbane on March 4, the City cancelled its session with Kohl, told Kohl that the contract would be awarded to Gilbane, and disclosed to Kohl, for the first time, "a large

_____

[4] According to plaintiffs, Gilbane's proposal deviated from the terms of the RFP by

> amend[ing] the "proposal pricing form," required by the RFP to state that Gilbane would sign the City's contract "subject to reaching a mutually agreeable resolution to the issues outlined in Gilbane's 2-C-03 letter to [the City's representative,] Mr. Timothy Clougherty."

(Am. Compl. ¶ 25.) Plaintiffs also assert that

> Gilbane's Phase 2 proposal . . . contained substantial exclusions, assumptions and estimates inconsistent with the RFP's requirements, including but not limited to Gilbane's omission of a guaranteed maximum price, a condition which the City required Kohl to satisfy.

(Am. Compl. ¶ 34.)

12

price disparity between the proposals." (Am. Compl. ¶¶ 30-31.) The "extraordinary price differential between the competitors"[5] is largely attributable to Kohl's use of a $25 million lease-buyback financing plan which involved costs not incurred by the revenue-bond financing plan included in Gilbane's proposal.[6] (Am. Compl. ¶¶ 31, 33.) Kohl based its proposal on the more expensive form of financing at the City's suggestion. (Am. Compl. ¶ 33.)

On March 12, 2003, Kohl protested the City's award to Gilbane.[7] (Am. Compl. ¶ 43.) A hearing was held on April 9, 2003, and the Selection Committee issued a four-page written decision on April 18, 2003. (Am. Compl. ¶ 44; Def.'s Mot. to Dismiss, Ex. E.) Kohl was allowed less than seven days to

---

[5] Kohl does not state the exact amount of the "extraordinary price differential" in its complaint. However, the Selection Committee decision states that "Gilbane's price was over $38 million lower than Kohl's." (Def.'s Mot. to Dismiss, Ex. E at 1.)

[6] Defendant disputes that allegation but, for purposes of deciding a motion to dismiss, it must be assumed to be true. See Cooperman, 171 F.3d at 46 (citations omitted).

[7] In its protest, plaintiffs also challenged certain terms of the RFP, principally the Section 10 protest procedure. In response, the Selection Committee ruled that plaintiffs' protest of the terms of the RFP was untimely.

examine materials produced to it by the City, was allowed only half an hour to present its case, was not permitted to examine any City employees, and was given a hearing before Timothy J. Clougherty, the same City official who had made the decision to cancel the negotiating session with Kohl. (Am. Compl. ¶ 44.) Kohl's protest was unsuccessful.

Based upon the foregoing, Kohl filed this suit, seeking a declaratory judgment that the City's contract with Gilbane is null and void, and seeking monetary damages in the form of: (1) proposal preparation costs; (2) the profits it would have earned had its proposal been accepted; and (3) the reasonable value of the services it provided the City by preparing a proposal containing ideas that the City was able to use, even without hiring plaintiffs. Plaintiffs' basic theory of recovery is that the City violated the ordinance when it cancelled the March 6 negotiating session, failed to evaluate both proposals based on the same scope of work, and failed to document the negotiations it held with Gilbane. Kohl also argues that the City is liable for giving Gilbane various unfair advantages and for breaking its promise to reimburse proposal preparation costs.

14

**Discussion**

The City moves to dismiss on grounds that Kohl waived its right to seek redress in this forum, under the terms of the RFP itself. Substantively, the City argues that the selection process was conducted in strict conformity with the RFP. Finally, the City offers count-by-count arguments for dismissal based upon failure to state a claim under each of the causes of action asserted by plaintiffs. Gilbane moves for dismissal on grounds that Kohl failed to protest the terms of the RFP in a timely manner and waived the right to sue the City, under the terms of the RFP.

I.   The Ordinance

Because many of plaintiffs' claims turn on their assertion that the City violated the ordinance, that is a good starting point. According to plaintiffs, the ordinance created an enforceable right to a negotiating session with the City. The City violated the ordinance, plaintiffs say, by cancelling the scheduled March 6, 2003, negotiating session with them. Defendant counters that its action was expressly allowed by Section 6 of the RFP.

15

The ordinance does not extend the right plaintiffs attempt to read into it. While its preamble allows the City to enter into competitive negotiations, the ordinance does not specify the form that such negotiations must take, and does not require the City to meet with each proposer. Thus, the RFP provision allowing the City to negotiate with only one candidate, if that candidate is "clearly more highly qualified and suitable than any other under consideration," does not violate the ordinance. Moreover, as discussed below, if plaintiffs thought the RFP violated the ordinance, their exclusive remedy was the pre-proposal protest procedure described in Section 10 of the RFP.[8] Because the ordinance did not create an enforceable right to negotiate with the City, plaintiffs' claims based upon an alleged violation of that right must necessarily fail.

II.  The RFP Protest Remedy

The City and Gilbane both argue that this suit should be dismissed because: (1) under the terms of the RFP, by submitting

_____

[8] Plaintiffs did, in fact, invoke the post-award protest procedure, arguing that the City violated the ordinance by failing to negotiate with them. That argument was rejected by the Project Selection Committee. (Def.'s Mot. to Dismiss, Ex. E at 3.)

16

a proposal, Kohl agreed that the Section 10 protest procedure would be its exclusive remedy for resolving any complaints about the City's decision to award the contract to Gilbane; and (2) Kohl never protested the terms of the RFP, thereby waiving any complaints about the format of the protest procedure.

Kohl counters that: (1) any argument based upon its failure to use the Section 10 procedure to protest the terms of the RFP improperly rests upon facts outside the complaint; (2) its failure to protest the terms of the RFP is not material because it was entitled to believe that the City would conduct the procurement process in accordance with the ordinance; (3) it never agreed to the City's protest procedure, and could not have done so, because Section 10 is extremely vague and does not fairly describe the limited hearing that was provided by the City; (4) the Selection Committee's decision is not binding because it resulted from a hearing held before a biased tribunal and because Kohl was given only a short time to present its case and was not allowed to cross-examine City witnesses; and (5) Section 10 is unenforceable as contrary to public policy because it allowed the Owners' Representative (Clougherty) to expand the

scope of the City's authority by conducting a protest procedure that violates the ordinance. Plaintiffs further argue that even if Section 10 is applicable, it bars only their request for a declaratory judgment voiding the contract award to Gilbane, but not their request for reimbursement of proposal preparation costs (based upon promises allegedly made outside the RFP) or their request for lost profits (based upon the City's alleged bad faith). Plaintiffs' arguments are unavailing.

If the copy of the RFP appended to defendant's motion to dismiss is authentic – and plaintiffs do not contest its authenticity – then defendant is entitled to dismissal because plaintiffs have no possibility of prevailing on the facts they themselves have alleged.

Most, if not all, of the allegedly unfair aspects of the City's protest procedure are described in the RFP. Therefore, the Section 10 pre-proposal protest procedure is plaintiffs' exclusive remedy. For example, the RFP provides that "[u]nless otherwise required by law, no evidentiary hearing or oral argument shall be provided, except, in the sole discretion of the

18

Owners' Representative, a hearing or argument may be permitted." (Def.'s Mot. to Dismiss, Ex. A at 41.) The RFP also provides that the decision on any protest will be made by the Owners' Representative. (Def.'s Mot. to Dismiss, Ex. A at 41.) Because the format of plaintiffs' post-award hearing and the fact that it was conducted by the Owners' Representative were express terms of the RFP, plaintiffs' sole avenue for challenge was the pre-proposal protest process established in Section 10.

As defendant correctly points out, despite being put on notice, well in advance of submitting a proposal, that the protest procedure gave them no right to present evidence or oral argument, and that any protest would be adjudicated by the Owners' Representative, plaintiffs never filed a pre-proposal protest of those terms of the RFP. Plaintiffs raised those issues only belatedly, in their post-award protest. Because the exclusive mechanism for challenging the terms of the RFP was a timely filed pre-proposal protest, which plaintiffs did not file, none of the alleged deficiencies in the protest procedure may now serve as a basis for relief in this court. See, e.g., Seal & Co. v. Wash. Metro. Area Transit Auth., 768 F. Supp. 1150, 1161 (E.D.

19

Va. 1991) (decided under federal law) (holding that "any claim that the language of an [RFP] is on its face ambiguous, or any latent ambiguity of which a contractor is aware, must be pursued prior to the opening of bids").

III. <u>The Award to Gilbane & Plaintiffs' Requests for Relief</u>

Because plaintiffs have been afforded an opportunity to fully present their protest of the award to Gilbane, under the terms set out in the RFP, their request for declaratory judgment is not properly before this court. Section 10 could not be more clear; the established protest procedure is the exclusive means for challenging the City's decision to award the contract to Gilbane. Plaintiffs accepted the exclusive remedy provision of Section 10 by declining to protest that term before they submitted their own proposal and, as a consequence, they validly waived their right to challenge the City's decision at this time in this forum.

While there is no New Hampshire case directly on point, several courts have ruled that once a person submits a proposal in response to an RFP, he or she gives up the right to protest

any of the terms of the RFP.  See, e.g., Arizona's Towing Prof'ls, Inc. v. State ex rel. Dep't of Admin., 993 P.2d 1037, 1039-40 (Az. Ct. App. 1999) (holding that contracting agency had no authority to hear protest of RFP terms when RFP stated that objections to defects had to be made prior to bid opening, and disappointed bidder had not filed timely, pre-bid, protest); Optiplan, Inc. v. School Bd., 710 So. 2d 569, 572-73 (Fla. Dist. Ct. App. 1998) (holding that unsuccessful bidder waived constitutional challenge to specifications of RFP by "fail[ing] to file a bid specification protest, and having submitted a proposal based on the published criteria); Fla. Dep't of Health & Rehab. Servs. v. E.D.S. Fed. Corp., 631 So. 2d 353 (Fla. Dist. Ct. App. 1994) (enforcing RFP's exclusive-remedy provision, when proposer failed to file a pre-submission protest, and rejecting claim that RFP protest procedure was inadequate because agency contracting officer was not impartial decision maker); Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1047 (Fed. Cir. 1994) (holding that in federal procurement, "protests based upon alleged 'improprieties' which are apparent in the RFP must be raised prior to bidding"); Alliant Techsystems, Inc. v. U.S. Dep't of the Navy, 837 F. Supp. 730, 736-37 (E.D. Va. 1993)

21

(explaining that post-award protest of RFP terms is barred by doctrines of estoppel and waiver: "Having waived its opportunity to protest the RFP while the possibility of changing the terms still existed, Alliant cannot now protest the award simply because its gamble [submitting a proposal without protesting the RFP terms] did not pay off.").

Plaintiffs are also barred from seeking reimbursement of their proposal preparation costs in this court. While they argue that the City made additional promises of reimbursement, outside the RFP process, the fact remains that reimbursement is a topic specifically addressed in the RFP, which brings resolution of reimbursement claims within the ambit of Section 10. Plaintiffs plainly understood that. In fact, they pressed their claim for reimbursement, unsuccessfully, through the post-award protest procedure.[9] (Def.'s Mot. to Dismiss, Ex. E at 4.) Because reimbursement for proposal preparation costs is a Section 10 matter (and one that has already been resolved against

_____

[9] In its decision, the Project Selection Committee found that "[e]ach proposer knew in advance of bidding on Phase 2 that such approval [from the Board and Mayor of Alderman, to reimburse proposal preparation costs] had not been obtained and that no reimbursement was to be expected by the disappointed bidder." (Def.'s Mot. to Dismiss, Ex. E at 4.)

plaintiffs), plaintiffs may not seek those costs in this court. Moreover, even if plaintiffs were entitled to litigate reimbursement in this forum, based upon promises made outside the RFP,[10] they have failed to allege that the Board of Mayor and Alderman actually appropriated funds for reimbursing proposal preparation costs, which, under Section 6, was a necessary prerequisite to any reimbursement.

Plaintiffs' attempt to recover lost profits stands on even shakier ground. While plaintiffs seek lost profits under four different theories, including promissory estoppel (Count III),[11]

_____

[10] As noted above, plaintiffs make only the barest conclusory reference to promises of reimbursement allegedly made by the City, rather than pointing to specific promises made by one or more identified City officials.

[11] In Count III, plaintiffs claim that the City promised that:

> (a) that the City would treat Kohl and Gilbane fairly and equally; (b) that proposals would be evaluated in a fair and competitive manner; (c) that a competitive negotiation process would be followed; and (d) that the City would reimburse the proposal preparation costs of the entity to whom the City did not award the Project.

(Am. Compl. ¶ 55.) According to plaintiffs,

> the City acted knowingly, willfully, and in bad faith in failing to fulfill its promises by accepting late and nonconforming submissions from Gilbane, providing

23

breach of the implied covenant of good faith and fair dealing

(Count IV),[12] bad faith (Count V),[13] and breach of contract (Count

IX),[14] a close reading of those four claims reveals that all the

---

material advantages in the procurement process to Gilbane, failing to make a good faith inquiry into the comparative merits of Kohl's and Gilbane's proposals, failing to conduct competitive negotiations, and instituting protest procedures which do not comply with due process requirements.

(Am. Compl. ¶ 57.)

[12] In Count IV, plaintiffs assert that the City breached the implied covenant of good faith and fair dealing by:

failing to carry out the procurement process promised in the Enabling Ordinance and the RFP, providing material advantages in the procurement process to Gilbane, failing to negotiate with Kohl as promised, and instituting protest procedures which do not comply with due process requirements.

(Am. Compl. ¶ 61.)

[13] Count V restates, in ¶ 65, the same list of wrongful acts enumerated in ¶ 61.

[14] In Count IX, plaintiffs restate, in ¶ 85, the same list of promises enumerated in ¶ 55. They further claim that the City breached an agreement with them by:

(a) failing to treat Kohl and Gilbane fairly and equally; (b) failing to evaluate proposals in a fair and competitive manner; (c) failing to follow the competitive negotiation process required by the agreement; and (d) failing to reimburse Kohl for its proposal preparation costs.

(Am. Compl. ¶ 87.)

24

wrongdoing alleged involves matters subject to the Section 10 protest procedure.

Having determined that all of the wrongdoing alleged by plaintiffs falls within the scope of the Section 10 protest procedure, it is necessary to address plaintiffs' contention that Section 10 is unenforceable because it violates public policy.

According to plaintiffs, Kohl was unable, as a matter of law, to waive its right to judicial review because allowing the Owners' Representative to conduct the procurement process (including presiding over the protest procedure), without any judicial check, is contrary to public policy. Plaintiffs cite several precedents establishing that New Hampshire law "will not enforce a contract or contract term that contravenes public policy." Harper v. Healthsource N.H., Inc., 140 N.H. 770, 775 (1996) (citing Audley v. Melton, 138 N.H. 416 (1994); Technical Aid Corp. v. Allen, 134 N.H. 1 (1991)). But they offer no support for the proposition that New Hampshire courts would find the exclusive remedy provision of the RFP violative of public policy.

25

While such exclusive remedy provisions may prove unenforceable in federal contracting, under 41 U.S.C. § 321, at least one state court has enforced such an RFP provision on grounds that "a party may waive any right to which it is legally entitled under the constitution, a statute, or a contract." E.D.S., 631 So. 2d at 355 (citations omitted). Tellingly, the court in E.D.S. noted that "[w]aiver does not apply . . . in transactions forbidden by statute or against public policy," yet went on to enforce the exclusive remedy provision in the RFP at issue. Id. (citations omitted). Furthermore, in Florida Department of Lottery v. GTECH Corp., 816 So. 2d 648, 651 (Fla. Dist. Ct. App. 2001) (citations omitted), the court explained that under Florida's administrative procedure act, the administrative tribunal is "the exclusive remedy for disputes arising in the competitive procurement process." Thus, it is by no means universally accepted in the realm of public contracting that established policy prohibits exclusive remedy provisions such as Section 10. In the absence of any New Hampshire authority deeming such provisions to be contrary to public policy, there is no basis for concluding that Kohl was unable, as

26

a matter of law, to waive its right to judicial review of the conduct, or outcome, of the City's procurement process.

Moreover, public policy supports strict enforcement of the doctrines of waiver and estoppel in situations such as this. A requirement that

> protests based upon alleged 'improprieties' which are apparent in the RFP must be raised prior to bidding . . . encourages the early detection of RFP errors, insures that each contractor's bid is based upon the same set of specifications and decreases the likelihood that the government would later be forced to issue a corrected RFP and reopen a solicitation.

Grumman, 15 F.3d at 1047 (citations omitted). As the court explained in Optiplan,

> [t]he purpose of such a [pre-proposal] protest is to allow an agency to correct or clarify plans and specifications prior to accepting bids in order to save expense to the bidders and to assure fair competition among them.

710 So. 2d at 572 (citations omitted). Here, Kohl had an opportunity to challenge the provisions of the protest procedure before submitting a proposal. Had it done so and lost, it might have obtained injunctive relief, delaying the submission process

27

until it obtained a decision regarding the legality of Section 10. And, it is possible that Kohl might have prevailed on a challenge to the exclusive remedy provision of the protest procedure (although Kohl has provided no New Hampshire authority supporting its position on that issue). But, like the disappointed bidder in Alliant, 837 F. Supp. at 737, Kohl made a business decision to let the pre-proposal protest deadline pass and gambled that it would not need, or could later challenge, the protest procedure. Public policy does not require the City to insure Kohl's gamble, and the mere fact that plaintiffs might have prevailed in a judicial challenge to an unfavorable pre-proposal protest does not excuse their failure to file such a protest when they had the chance.

Finally, this is hardly the usual competitive bidding case, in which a disappointed low bidder protests the award of a contract to a higher bidder. Plaintiffs have not suggested how the public may have been harmed by the City's decision to negotiate a contract for $38 million less than the cost of plaintiffs' proposal. See Irwin Marine, Inc. v. Blizzard, Inc., 126 N.H. 271, 274 (1985) (quoting 10 E. MCQUILLIN, MUNICIPAL

28

CORPORATIONS § 28.45, at 144-45 (3d ed. rev. 1981) ("In the context of municipal contracts, competitive bidding statutes are intended for the benefit of property holders and taxpayers, not that of the bidders, and for the purpose of guarding against 'favoritism, improvidence, extravagance, fraud and corruption . . .'").

In sum, the ordinance did not create an enforceable right to a negotiating session with the City; all of the complaints raised in this case were subject to the resolution procedure described in Section 10 of the RFP, and, under New Hampshire law, Section 10 is not unenforceable against Kohl. Accordingly, defendants are entitled to dismissal.

## Conclusion

For the reasons given above, defendant's motion to dismiss (document no. 7) is granted. The Clerk of the Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

                                                                    _____
                                                                    Steven J. McAuliffe
                                                                    United States District Judge

October 30, 2003

cc:  E. Tupper Kinder, Esq.
     Robert J. Meagher, Esq.
     Andrew W. Serell, Esq.